**JOHNSON**

v.

**KANSAS CITY PUBLIC SERVICE CO.**

No. 43550.

Supreme Court of Missouri.

Division No. 2.

March 8, 1954.

Charles L. Carr, Hale Houts, J. D. James, Hogsett, Depping, Houts & James, Kansas City, for appellant.

Hugh B. Downey, Harry A. Morris, Thomas M. Sullivan, Kansas City, for respondent.

WESTHUES, Commissioner.

This is an action to recover damages for personal injuries allegedly sustained by plaintiff who was a passenger on a street-car of the defendant company when it collided with a tractor-trailer truck at the intersection of 7th Street and Chelsea Avenue (sometimes referred to as Richmond Boulevard) in Kansas City, Kansas. A trial resulted in a verdict for plaintiff in the sum of $15,000. Defendant's motion for new trial was denied and defendant appealed from the judgment entered.

The defendant on this appeal, in its brief, complains of: two instructions given by the trial court at plaintiff's request; the refusal of an instruction offered by the defendant; the excessiveness of the verdict; and the failure of a juror to disclose on voir dire examination that he had had two claims for personal injuries. We shall dispose of the points in the order mentioned.

The facts as shown by the evidence are as follows: 7th Street is a north-south street, 52 feet in width, and Chelsea Avenue runs east and west. There are no stop signs on 7th Street at Chelsea but there are stop signs on Chelsea. The defendant maintains double streetcar tracks on Chelsea Avenue. On May 28, 1945, at about 10:00 P.M., plaintiff was a passenger on a westbound streetcar on Chelsea Avenue. When the streetcar reached a point a few feet west of the center of the intersection of 7th and Chelsea, it collided with a heavy transport tractor-trailer, loaded with hogs, going south on 7th Street. The collision caused plaintiff to be thrown from the streetcar to the street and to be seriously injured.

Plaintiff's evidence was that the streetcar was not stopped at the stop sign before entering the intersection; that the streetcar was going about 20 miles per hour and struck the trailer portion of the tractor-trailer as it was crossing the intersection in the west half of the street. Defendant introduced evidence that the streetcar was stopped before entering the intersection and then proceeded west at a speed of about 2 to 4 miles per hour; that about the time the front portion of the street-car crossed the center of the street, the tractor-trailer, going at about 25 miles per hour, entered the intersection, swerved to the right so that the tractor missed the streetcar but the trailer struck and tore the vestibule off the streetcar. The tractor-trailer turned over on the west side of the intersection.

Defendant says "Instruction 4 authorized a verdict for plaintiff for failure to yield the right of way even if the street-car was stopped at the stop sign." Defendant argues that the instruction should not have been given because the "Failure to yield the right of way was not charged by the petition." By instruction No. 4, the court told the jury that it was defendant's duty to exercise the highest degree of care and if the motorman saw or could have seen the tractor-trailer approaching the intersection in time to have avoided a collision "by stopping at said stop sign and yielding the right of way to said tractor-trailer" and failed to do so, then a verdict for plaintiff was authorized. The question of yielding the right of way was an issue in the case from the beginning of the trial to the end thereof. Note what counsel for the defendant told the jury in the opening statement:

"The ordinances require that after stopping he must yield the right-of-way to any traffic so near to any traffic in the intersection or so near to the intersection as to constitute an immediate hazard. But having yielded the right-of-way to any traffic in the intersection or so near as to constitute an immediate hazard, he has a right to go on through, of course."

Note instruction B requested by the defendant and given by the court: "The court instructs the jury that if you find and believe from the evidence that operator Christian stopped the car at the stop sign located on the east side of the intersection in question before proceeding through the said intersection and thereby under all the facts and circumstances in evidence yielded the right of way, if so,

then your verdict will be for the defendant."

■ Defendant's theory of defense was that the streetcar was stopped at the stop sign and then proceeded across the intersection at a low rate of speed from 2 to 4 miles per hour; that the tractor-trailer was so far from the intersection that the streetcar operator was not in duty bound to yield the right of way. The petition did not use the words "yield the right of way" but charged that the "operator saw, or by the exercise of the highest degree of care could have seen the said truck approaching the said intersection and in danger of collision with the said streetcar, in time to stop the said streetcar, or slacken its speed, * * *." We hold that was sufficient and was, in fact, a charge that the operator of the streetcar failed to yield the right of way. The issue was tried and submitted to a jury. Its finding was against the defendant and there is no legal ground for complaint. Defendant cites a number of cases supporting the rule of law that it is error to instruct on an unpleaded ground of negligence. Among the cases is Beahan v. St. Louis Public Service Co., 361 Mo. 807, 237 S.W.2d 105. That case does not aid the defendant. Defendant throughout the trial met the issue of "yielding the right of way" and the wording of the petition was sufficient to place that question in issue.

■ Defendant contends that instructions 1 and 4 given by the court were erroneous "because they told the jury that defendant owed plaintiff the highest degree of care without the qualification of 'practicable'." The collision in question occurred in Kansas and defendant cites Picou v. Kansas City Public Service Co., 156 Kan. 452, 456, 134 P.2d 686, as authority for its contention. In that case, the question of the correctness of an instruction was not presented or considered by the court. The plaintiff was injured when he slipped on a banana peeling in the aisle of a streetcar. The court held that plaintiff failed to prove that the street car company by the exercise of the highest degree of care practicable could have discovered the object in time to have removed it before the plaintiff fell. Defendant relies on the statement of the court to the effect, 134 P.2d 689(2), "The established rule is that a carrier of passengers for hire, including a street railway company, is required to use the greatest skill, care and foresight practicable for safety of its passengers". In the reply brief, defendant says the Kansas Supreme Court in the case of Dryden v. Kansas City Public Service Co., 172 Kan. 31, 238 P.2d 501, approved the holding in the Picou case, supra. In the Dryden case, 238 P.2d loc. cit. 504(1), the court said, "The plaintiff being a passenger for hire on defendant's bus, the driver was held to the highest degree of care for his safety and is liable for the slightest negligence." This statement was followed by citations of authorities including a quotation from the Picou case. In those cases, it is evident that the Supreme Court of Kansas did not hold or indicate that the word "practicable" in any way modified or minimized the degree of care as is understood by the term "highest degree of care". The court emphasized in the Dryden case, supra, that the streetcar company was liable for the slightest negligence. We hold the omission of the word "practicable" did not render instructions 1 and 4, here under consideration, erroneous.

■ Defendant contends the court erred in refusing defendant's requested instruction which told the jury that if they found from the evidence that the operator of the streetcar stopped the car at the stop sign before proceeding through the intersection, then the verdict should be for the defendant. Defendant argues that it was entitled to this instruction. Of what avail would be obedience to a stop sign if, after the stop, the operator of a motor vehicle or streetcar would drive through an intersection at a time when other vehicles were passing through the intersection? To stop at a stop sign means to stop until it is safe to proceed through an intersection. Further comment should not be necessary but as further answer to the question we quote, at the expense of repetition, the statement defendant's counsel made to the jury: "The

ordinances require that after stopping he must yield the right-of-way to any traffic so near to any traffic in the intersection or so near to the intersection as to constitute an immediate hazard." The instruction was properly refused.

It is urged that the verdict of $15,000 is grossly excessive. In this connection it must be stated that plaintiff received $2,000 from the truck company. Plaintiff, at the time of her injury, was thirty-nine years old. She was well educated and had taught school for a number of years. At the time of the injury, she held a responsible position with the Garell Brokerage Company of Kansas City. Her duties included some bookkeeping and typing. Her principal duties at the time she was injured were those of supervisor of the office including the sales department. As such supervisor, she received commissions on sales. Her earnings as shown by income tax returns were as follows: "For the year 1943, $6,511.75; for the year 1944, $7,716.20; for the year 1945, $6,388.25; for the year 1946, $8,398.75; for the year 1947, $4,904; for the year 1948, $2,695; for the year 1949, $2,519; for the year 1950, $1,849; for the year 1951, $2,185."

After plaintiff's injury, she continued in her employment at the brokerage firm but the nature of her work was changed. Due to an injury to her left hand, she could no longer type so her duties were confined solely to those of the supervisor of sales. The brokerage company terminated her employment in June, 1948, after which plaintiff obtained other work and earned the above-indicated amounts.

Defendant points to the fact that plaintiff earned more in 1946, the year after the injury, than before and, therefore, she cannot claim loss of earnings. However, the large earning in 1946 was due, as plaintiff explained, to commissions on sales made before she was injured; that due to an unusual demand for goods caused by the war, sales were up but deliveries were slow and, therefore, a portion of the amount plaintiff was paid in 1946 was for commissions earned during prior years.

Plaintiff contends that due to her injuries, she became very nervous and that this brought on her inability to continue with the brokerage company. Her evidence was that she was a very healthy woman before her injury and that her nervousness was due to the injuries she received in the collision. The evidence of a number of witnesses supported plaintiff's theory.

Defendant, in the brief, says, "The fact that plaintiff was 39 years of age at the time of the accident and 47 at the time of the trial is sufficient to account for her diminished activity in the athletic sports in which she had engaged in college, and to account for the testimony of three friends that she was not the girl she used to be." Defendant makes the further statement that "She was discharged by the brokerage company in June, 1948, over three years after the accident, because of friction which developed between her and three salesmen who were working under supervision, and because her employer was confronted with the necessity of discharging either plaintiff or all of the salesmen." Defendant says plaintiff's nervousness causing the friction was probably due to her age.

Plaintiff sustained numerous cuts and bruises over her entire body. One witness stated she had too many cuts to count. Plaintiff's left arm and hand have been permanently injured and the hand over 50% incapacitated. She sustained injuries to her knees making it difficult to take walks. Her testimony was that she has had trouble sleeping since the accident and is very nervous and in addition to this, she has suffered much pain due to the injury to her arm and the numerous bruises. Her hospital bill was about $135; doctors' bills, $348; dentist's bills, $800; and $525 for help at home after she left the hospital. Plaintiff is no longer able to drive a car, type, play the organ for church services, take long walks, all of which she did before the injury.

A doctor, who examined plaintiff at defendant's request, shortly before the trial which was seven years after the injuries were sustained, testified that "there was a

joint noise" in plaintiff's knees "which I could both feel and hear"; that he found a number of scars and about 50% permanent disability of the left hand. A dentist testified that he did dental work for plaintiff after the injuries and found one tooth broken and others injured; that his bill of $800 for work was mostly due to her injuries.

 We do not think it necessary to cite authorities to sustain the verdict. The loss of wages up to the time of trial, conservatively speaking, amounted to at least half of the amount of the verdict. We rule the verdict not to be excessive.

On the voir dire examination, the jurors were asked a general question: "Have any of you ever brought a suit or had a suit in which you were seeking to recover damages of this type?" A number of jurors answered and extensive questioning continued, covering about 20 pages of the record. Defendant's counsel then asked, "Do any of you have any claims or have any of you ever had any claims against any person or any company, either for personal injuries or property damage?" Some of the jurors answered but a juror named Isenhart did not. After the trial was over and in support of the motion for new trial, it was shown that juror Isenhart in 1916 was paid on a claim under the Iowa Compensation Law and in 1946, he had a claim against Kansas City, Missouri, for injuries received when a car he was driving dropped into a depression in a street. He was paid $400 on that claim. An affidavit of Isenhart was filed on the motion for new trial wherein he stated that he did not mention the claims because he thought the question pertained to suits against the Kansas City Public Service Company.

Whether a new trial should be granted in the circumstances as here presented rests largely within the discretion of the trial court. Davis v. Kansas City Public Service Company, Mo., 233 S.W.2d 679, loc. cit. 684, 685(7), and cases there cited. Defendant cites Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d

459, but in that case an entirely different situation was presented. The court concluded that the juror had intentionally concealed the fact that he had had a claim against the defendant in the case and it was shown the juror bore ill will toward the defendant. We do not have any fact in this case tending to indicate that juror Isenhart was prejudiced against the defendant or that he intentionally concealed the fact that he had been paid a compensation claim in Iowa and had settled a claim against Kansas City, Missouri. It was not shown that either claim engendered any ill feeling or that the issues involved were similar to the issues in the case being tried. We are in no position to say that the trial court abused its discretion.

The judgment is affirmed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court.

All concur.