Mildred C. HORNBERGER, Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant.

No. 48532.

Supreme Court of Missouri,

Division No. 1.

Jan. 8, 1962.

Motion for Rehearing or for Transfer to Court en Banc Denied Feb. 12, 1962.

V. James Ruddy, St. Louis, for appellant.

Morris A. Shenker, St. Louis, John E. Bardgett, Clayton, Douglas O'Neill, St. Louis, for respondent.

COIL, Commissioner.

Mildred Hornberger, plaintiff below, claimed damages for alleged personal injuries in an action against St. Louis Public Service Company and Ernest English. A jury awarded her $35,000 against the company and decided for defendant English. Upon plaintiff's compliance with a conditional order of remittitur, company's new trial motion was overruled and a judgment for $17,500 entered from which the company has appealed. Plaintiff submitted her case on res ipsa loquitur against the company and on specific negligence against English. ("Defendant" hereinafter will refer to the St. Louis Public Service Company.)

Defendant contends the trial court erred in giving res ipsa instruction 6 for the reason that plaintiff's evidence was such that an inference that the collision was not the fault of defendant was as reasonable as an inference that it was.

About 9:30 in the morning of December 8, 1958, plaintiff was a passenger on defendant's bus westbound on Florissant Road. She testified that she sat in the middle of the long rear seat which extended the width of the bus; that at some point shortly prior to a collision she noticed the driver of the bus extend his hand to-

ward or place it upon and look down at the money box; that the bus swerved to the right, throwing her off the seat against the edge or side of the lengthwise seat just ahead; that her back struck against the front edge of the long seat and her knee struck the edge of the other seat, and that she was wedged between the two seats with her head resting against the back of the long seat; that she heard a collision which "hitched" her backward, and when that happened she couldn't get up until she was assisted by other persons. The bus came to a stop with its front just west of and most of it under the Wabash Railway overpass at Florissant Road. Plaintiff testified further that as the bus approached downhill to the overpass it was in the inside westbound lane but after it swerved and came to a stop it was in the outside westbound lane; that there had been a freezing rain falling and there was a little "sheet of ice" at the time of the accident; and that as the bus drove off after the accident she saw the automobile with which it had collided which was then on West Florissant's north shoulder.

Two bus passengers testified for plaintiff. One said she was reading the paper and heard someone say that the bus was going to hit a car; she heard a crash and saw that a car had been hit in front of the bus; that there was a lady wedged down between the seats in the rear and other ladies were trying to pick her up. The other, who was sitting on the back seat with plaintiff and another, said that all of a sudden the bus made a swerve and threw her over and she caught the seat in front of her; that the lady other than plaintiff sitting on the back seat was pitched into the aisle, and the plaintiff fell to the side; that she heard the screech of the bus; and that plaintiff was complaining of her back and asked for help and they assisted her.

Plaintiff read in evidence as admissions against interest certain answers given by defendant English in a deposition. Those answers in substance were that he was in-

volved in a collision with a bus on December 8, 1958, on Florissant Road near the overpass; that he was driving an automobile eastwardly on Florissant and got across the center line onto the westbound portion of the road before the accident and was on the wrong side of the road at the time of impact.

As we understand it, defendant concedes that plaintiff properly could have submitted her case under the res ipsa loquitur doctrine but for the fact that she adduced as part of her case the admissions of codefendant English above noted. To support the contention that those admissions repelled any inference of negligence on the part of defendant's bus operator or, at least, showed a state of affairs justifying a reasonable inference that the accident was due to a cause other than its negligence, defendant relies upon Niklas v. Metz, 359 Mo. 601, 222 S.W.2d 795. In that case the court correctly held that plaintiff's evidence "demonstrated, so as to leave no room for inferences to the contrary, that the bus operator exercised the highest degree of care and was not guilty of any negligence proximately concurring to cause the collision and death." 222 S.W.2d 797. In the Niklas case a bus and a truck were approaching from opposite directions. Plaintiff was a bus passenger and her evidence showed that when the bus driver saw the truck 300 to 350 feet away approaching astride the center line around a sweeping curve, he turned the bus to the right and, after the bus was off the pavement except for the left rear wheel, the truck struck the rear one third of the bus, tearing out its side and rear. The truck's tracks began at the center line of the pavement and extended across the west side of the pavement for 45 feet to the bus "as it was almost stopped and almost entirely off the pavement on its right side of the highway." It was upon those facts that the court reached the conclusion above quoted.

In Long v. St. Louis Public Service Co., Mo.App., 288 S.W.2d 417, the court recognized the proposition stated in the Niklas

case, supra, that "no recovery can be had where a plaintiff, after making a prima facie case under the res ipsa loquitur doctrine, goes further and produces evidence which repels any inference of negligence on the part of the operator of the vehicle involved in the accident. Niklas v. Metz, 359 Mo. 601, 222 S.W.2d 795; Heidt v. People's Motorbus Co. of St. Louis, 219 Mo.App. 683, 284 S.W. 840." 288 S.W.2d 420, 421. The court also recognized the proposition that "if a plaintiff, in making out a case of specific negligence against one joined as a co-defendant with a carrier charged under the res ipsa loquitur theory, produces evidence which conclusively shows that the negligence of the one specifically charged was the sole cause of the accident, no recovery can be had against the carrier on any theory of liability. Rothweiler v. St. Louis Public Service Co., Mo.App., 224 S. W.2d 569." 288 S.W.2d 420[2, 3]. In the Long case plaintiff was a passenger on defendant's bus as it proceeded southwardly on Eighth Street into the south half of Washington Avenue where it was struck by an eastbound automobile. The court said with respect to the situation shown by the evidence:

"In addition to making a prima facie case under the res ipsa loquitur doctrine, plaintiff offered considerable evidence with respect to the movements of the bus and the automobile of defendant May just prior to the collision, but this evidence was not developed to the point where it proved conclusively that the bus driver was at all times in the exercise of the highest degree of care and not guilty of negligence. It appears from the evidence that the bus entered the intersection and attained a speed of nine miles per hour. It proceeded across the intersection with undiminished speed until it came into collision with the automobile of defendant May. It does not appear from the plaintiff's evidence whether the bus driver, when he entered the intersection or thereafter, took the precaution to look to the west for approaching traffic. At some point prior to the accident it must have become apparent that a collision was imminent, for it appears that the automobile was for some time prior to the collision proceeding toward the path of the bus with undiminished speed. Yet there is no explanation why the bus driver was unable to avert a collision, either by stopping, swerving, or checking the speed of the bus.

"In our judgment the evidence falls far short of proving conclusively that the bus driver was at all times in the exercise of the highest degree of care, and that the plaintiff's injuries were caused solely by the negligence of defendant May. It was, therefore, quite proper to submit the case against appellant under the theory of res ipsa loquitur." 288 S.W.2d 421.

In the present case the fact that defendant English crossed the center line prior to the collision and was on the wrong side of the street at the time of the impact did not repel the inference of defendant's negligence. Plaintiff's evidence might have supported an inference that defendant English's car skidded onto the wrong side of the street due to ice on the street or was there due to negligent operation by English; but whether defendant English's being on the wrong side of the street was a proximate cause of plaintiff's injury and, if so, whether it was also the sole cause of the collision or whether the operator of defendant's bus was also negligent depended upon circumstances not shown in plaintiff's evidence. Plaintiff's evidence, for example, did not show the location of the bus at the time English's automobile crossed the center line, the relative positions of the vehicles at the time of the collision, whether the English car was then stopped, the bus's speed as it approached the impact point, or traffic conditions in the immediate vicinity. In the absence of a showing by plaintiff of facts and circumstances repelling a reasonable inference of the operator's concurring or contributing negligence, plaintiff was not precluded from submitting her case on the res ipsa loquitur theory against the company. Rothweiler v. St. Louis Public Service Co., Mo., 234 S.W.2d 552, 553, 554. As

a matter of fact, defendant English's evidence, which later came into the case, was to the effect that his car slid to the left across the center line and into the outside westbound traffic lane and came to a stop when the bus was 150 or 200 feet east of him; that at the time there was no other traffic; that as his car sat there stationary the bus, which was traveling westwardly in the inside westbound lane, when about 60 feet from his stationary automobile, swerved to the right and into his car. And the jury found either that English was not negligent or, if so, his negligence was not a proximate cause of the collision.

While, as noted above, the Niklas case, supra, stands for the proposition we have heretofore stated, it is true that the opinion quotes the following from McGrath v. St. Louis Transit Co., 197 Mo. 97, 94 S.W. 872, 874, upon which defendant relies as here applicable: "Where all the facts connected with the accident fail to point to the negligence of the defendant as the proximate cause of the accident, but show a state of affairs where an inference could be as reasonably drawn that the accident was due to a cause or causes other than the negligent act of the defendant, then the plaintiff cannot rely upon mere proof of the surrounding facts and circumstances of the accident, and the defendant is not called upon to explain the cause of the accident, and to purge himself of the imputed or inferential negligence."

■ Whatever may be said as to the correctness of the above, if applied literally to fact situations different than that existing in the McGrath case, it is clear that where a carrier injures a passenger by colliding with a private vehicle, the passenger may submit a res ipsa case against the carrier unless his evidence repels any inference of the carrier's negligence in the operation or maintenance of the bus. Rothweiler v. St. Louis Public Service Co., supra; Long v. St. Louis Public Service Co., supra.

■ Defendant contends the court erred in giving plaintiff's res ipsa instruction 6 for the reason that it permitted and required the jury to find that plaintiff was injured as a result of the "collision mentioned in the evidence when there was no evidence to support such a finding and all the evidence was to the effect that plaintiff received her injuries as a result of the bus swerving to the right prior to the collision and [that] the collision itself occurred subsequent to the plaintiff's fall and injury." As will be noted from the summary of plaintiff's testimony set forth above, plaintiff testified that it was the swerving of the bus which threw her off the seat and wedged her between the seat and the one immediately in front of her, and that thereafter she heard the crash of the collision and when the collision occurred it "hitched" her backward. Plaintiff's instruction 6, a usual res ipsa submission, after hypothesizing that the bus and auto collided, was, in part, "and if you find that on the said occasion the plaintiff Mildred Hornberger was a fare-paying passenger aboard said bus, and if you find that *as a direct result of the aforesaid collision* the plaintiff Mildred Hornberger was injured, if so, then you are instructed that such facts," etc. (Our italics.)

We point out that defendant does not contend that the evidence of the manner in which plaintiff was injured was not within the averments of plaintiff's petition; nor does defendant contend that it objected at any time to the medical testimony concerning plaintiff's injuries on the ground that they were not caused by the "collision" as pleaded. Indeed, the hypothetical questions asked three doctors who testified for plaintiff, to establish that the injuries resulted from the trauma sustained in the accident, hypothesized in one instance that the bus swerved to the right and crashed into a car, a collision occurred, and when this occurred plaintiff slipped down, etc.; in another, that the bus swerved to the right and collided with the vehicle; and in the third instance, that when the bus swerved to the right and collided with an automobile at which time

plaintiff was caused to slide off the seat. Technically, therefore, defendant is incorrect in saying that there was "no evidence to support such a finding," i. e., that plaintiff was injured as a result of the collision. That is because plaintiff's doctors, in response to hypothetical questions (unobjected to for any reason here pertinent) testified that plaintiff was injured, in part at least, as a result of the collision.

We prefer, however, to base our ruling on the broader ground that our examination of the record discloses that the case was tried as though the swerving of the bus and its colliding with the automobile constituted "the collision." Defendant relies upon Hughes v. Kiel, Mo.App., 100 S.W.2d 48. There plaintiff had pleaded that a certain collision caused an injury. His proof showed and his instruction submitted that the injury was caused by an abrupt stop of the vehicle prior to the collision. In the Hughes case, counsel consistently objected to the admission of evidence as to the sudden stopping as a cause of injury on the ground that plaintiff had pleaded that the collision caused the injury. No such question is involved in the present case. As we have noted, defendant in this case made no objection to evidence of injury as a result of the swerving and the colliding.

We are convinced that the jury understood, as apparently did the parties and trial counsel, that "the collision" as used in instruction 6, described the occurrence which consisted of the bus's swerve and its impact with the automobile.

■ Defendant also contends that the trial court erred in giving instruction 6 for the reason that it assumed that defendant was negligent. After informing the jury that it could find defendant negligent unless it found and believed from other facts and circumstances that plaintiff's injuries were not due to defendant's negligence, the instruction proceeded: "and if you do find from the evidence in the case that the defendant, St. Louis Public Service Com-

pany, a corporation, was negligent and that plaintiff's injuries, if any, were caused thereby or if you find that such negligence of the St. Louis Public Service Company, a corporation, combined and concurred with the negligence, if any, of the driver of the automobile mentioned in evidence and thereby directly contributed in part to cause the plaintiff to be injured," etc.

Defendant contends that the words "or if you find that *such* negligence" (our italics) assumed that defendant was negligent. It seems plain that "such negligence" referred to the negligence which the jury had been required to find by the language immediately preceding the words in question. It would have been proper to have inserted "if any" after "such negligence" but it was unnecessary here. That is because in any reasonable view of the language used the jury must have understood that before it could find for plaintiff it had to find that some negligence of defendant was a proximate cause of plaintiff's injuries.

Defendant next contends that the trial court erred in admitting the testimony of a doctor's diagnosis of plaintiff's condition allegedly based upon another doctor's opinion.

Plaintiff's family physician, Dr. Weekes, testified that he examined plaintiff on the day of the accident and found that her lower middle back was tender and pressure there caused pain to radiate down both her legs; that he sent her the next day to Dr. Allen, a radiologist, for X rays; that on December 21, 1958, she was hospitalized for a myelogram and further X rays in connection therewith; that the myelogram was performed by Dr. Jackson, an orthopedic surgeon. The radiologist's report was in evidence as plaintiff's Exhibit A and the X rays taken on both occasions were in evidence as plaintiff's Exhibit B. The X rays were displayed to the jury and interpreted by the radiologist who took them and who testified for plaintiff. The report, Exhibit A, stated the facts as reflected by

the X rays in the opinion of the radiologist. On direct examination, Dr. Weekes testified that he saw the X rays taken at the time of the myelogram but did not read them because he did not feel qualified to state what they showed; that all his X-ray work was done by a radiologist. He was then asked his conclusion as to the injuries plaintiff had sustained. He answered that plaintiff had sustained a ruptured intervertebral disc. After further testimony by the doctor (about five pages in the record), defendant's counsel, as the first question on cross-examination, asked Dr. Weekes whether he was basing his diagnosis on the interpretation of those X rays. He answered, "I am basing my diagnosis on the interpretation of the x-rays and the patient's symptoms" and he later said he based his diagnosis on the symptoms, that is, the pain radiating to plaintiff's legs, plus the findings in the X rays.

On each of the occasions noted, defendant's counsel objected to all the direct testimony concerning the doctor's diagnosis because it constituted the "opinion of one doctor based upon the opinion of another."

■■ It is improper for one expert to base his opinion upon the oral or written opinion of another expert unless the opinion of such other expert is in evidence and is included as an assumed fact in a hypothetical question. Baumhoer v. McLaughlin, Mo.App., 205 S.W.2d 274, 280[4–7]; Boring v. Kansas City Life Ins. Co., Mo., 274 S.W. 2d 233, 238[2, 3]. The X-ray report was in evidence. The X rays were later exhibited to the jury. The radiologist, Dr. Allen, interpreted the X rays for the jury. It seems apparent, therefore, that Dr. Weekes, in giving his conclusion as to plaintiff's injury, did nothing more than to assume the truth of the facts shown by the X rays as interpreted by the radiologist just as if the question had been asked in hypothetical form. Under those circumstances, the admission of the testimony in question was not objectionable.

■ Defendant contends that the trial court erred in refusing a new trial on the ground that one of the jurors who sat in the case failed to disclose in his answer to a question on voir dire that he had theretofore had a property claim against defendant. On voir dire, defendant's counsel asked this question: "Now, I would like to ask one general question, Mr. Hardin and Mr. Lampe have explained that they had been injured in accidents and had claims, is there anyone on the panel who has ever had a personal injury claim or a claim for damage to their automobile against the St. Louis Public Service Company, other than Mr. Lampe, by that I mean, was anyone injured on the bus and made a claim against the Public Service Company? * * * I take it by your silence then that no one on the panel has ever had a claim against anyone, any individual or corporation, or any partnership, for personal injuries, whereby they were injured and you were injured and brought claim against someone."

After several of the members of the panel answered with respect to claims, including a property damage claim and injuries for which workmen's compensation claims were involved, defendant's counsel again asked: "Now, I would like to ask you, repeat the question, is there any member of anyone's immediate family such as wife, husband, brother, sister, or anyone who had a claim against anyone for personal injuries received in any type of accident?" There was a response about a personal injury claim.

At a hearing in connection with defendant's motion for new trial, juror O'Mara testified that he recalled a question on voir dire about having had a claim for damages against defendant, although he did not remember any details about being asked such a question; that he had completely forgotten about the fact that he had had a claim until the day before the new trial hearing when he had called defendant's attorney to inquire as to why he (the witness) had been subpoenaed; that the lawyer answered by asking whether the witness had had a claim in 1949; that he got to thinking about it

and from his recollection and from the letters concerning it which were later shown to him, he remembered or concluded that he did have a $126 property damage claim eleven years previously which had been turned over to his family attorney for attention; that he did not remember that he had had such a claim when asked on voir dire and did not remember it during the trial; that it was not mentioned or discussed in any way in the jury room and that it had not influenced his verdict; that if he had recalled that he had had such a claim he would have disclosed the fact; and that there had been no attempt on his part to hide or conceal anything.

The questions asked by defendant's counsel demonstrate that it would have required a sharply attentive panel member to have realized that those questions required answers as to claims for property damage as distinguished from personal injury claims. Assuming, however, that Mr. O'Mara should have been aware of the fact that counsel's question had, more or less, incidentally included property damage claims as well as those for personal injury, it clearly appears that the trial court reasonably could have found that Mr. O'Mara did not intentionally withhold or conceal any information and, thus, that the trial court did not abuse its discretion in overruling the motion for a new trial on the stated ground. What the court said in Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348, 351[3, 4], is applicable and adversely decisive of defendant's contention:

"In a case such as this, where a jury has failed to disclose some fact on voir dire examination which might reasonably have affected his qualification to sit as a juror in the case, the question of what consequence shall follow resolves itself into one of whether he was guilty of an intentional concealment of the matter concerning which he was being subjected to interrogation. If the conclusion be reached that his failure to answer amounted to deception, and that the losing party was thereby denied the fair trial to which it was entitled, the only effective remedy would be to set aside the verdict and award a new trial. Piehler v. Kansas City Public Service Co., supra [357 Mo. 866, 211 S.W.2d 459]. However an unintentional failure to disclose information not directly connected with the case does not necessarily show prejudice on the part of the juror so as to call for the trial of the case anew. Davis v. Kansas City Public Service Co., 361 Mo. 61, 233 S.W.2d 679; O'Brien v. Vandalia Bus Lines, supra [351 Mo. 500, 173 S.W.2d 76]. In the final analysis, therefore, the question of what the result shall be must be left primarily to the discretion of the trial court, reviewable only for abuse, and with the court's decision to conclude the matter unless an abuse of discretion unmistakably appears. Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795." (Bracketed inserts ours.) See also Johnson v. Kansas City Public Service Co., Mo., 265 S.W.2d 417, 421.

Defendant's final contention is that the verdict was so grossly excessive as to conclusively prove that it was the result of passion, prejudice and misconduct on the part of the jury. Defendant contends also that, in any event, the judgment as reduced by remittitur is excessive.

 The jury returned a verdict of $35,000, the amount sued for. Excessiveness of a verdict, even gross excessiveness, does not necessarily establish misconduct or passion and prejudice on the part of the jury. McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361, 369. Defendant's new trial assignment that the verdict was so excessive as to evidence passion, prejudice, and misconduct on the part of the jury was overruled by the trial court who thereby found that the amount of the verdict did not indicate passion, prejudice, or misconduct. Defendant points to nothing, and we have found nothing in the record, to support the conclusion that the verdict was the result of passion or prejudice or misconduct on the part of the jury.

Plaintiff, a widow 57 years of age at trial time, for several years had done general

housework one day a week for each of several employers. She made $48 a week for 50 weeks each year. Her work consisted of cleaning, ironing, and other tasks which required stooping and bending and much physical effort. She had been in good health and was able to do that work each day prior to the accident. Following the collision, she "baby-sat" until about 3:30 p. m., although she experienced pain. When she returned home she called the family physician, Dr. Weekes. She was experiencing pain in her back, her right arm and shoulder, and in her right knee and leg, and shooting pains down the backs of both her legs. The doctor gave her medicine for pain and advised X rays which were made the next day. Dr. Weekes saw her that day and then every other day at her house until December 21 when she was hospitalized for a myelogram. During the period from December 8 to December 21 she was in bed receiving heat treatments and medicine for blood pressure. On the 21st, a myelogram was done and further X rays taken. She was in the hospital three days and thereafter remained under Dr. Weekes' care in her home. He prescribed a back brace which she purchased on January 2, 1959, and wore continuously for three months and has worn since at all times except at nights. She has continuously slept on a board under her mattress. Dr. Weekes saw her once a week for a time after she left the hospital and later every two or three weeks. Her back has continued to hurt constantly, although it pains more severely when she makes a misstep or tries to bend and she has difficulty in negotiating stairs. She can't stoop to pick up things from the floor, cannot wash woodwork, or stand on a ladder, or vacuum, or carry pails of water, because when she attempts to do any of those things her back pains too severely. She has not worked since the accident except for one night's "baby-sitting." She has had help in her home since the accident. She paid $59.09 for the brace, Dr. Allen's bill of $15, Dr. Jackson's bill of $25, and People's Hospital bill of $79.20. She had

not paid Dr. Weekes' bill at trial time. She had not seen Dr. Jackson or Dr. Allen since the hospitalization except for an examination by each a week before trial. She still took medicine prescribed by Dr. Weekes, used a sleeping board, and wore the brace.

Four of plaintiff's former employers testified that she formerly had worked for them, had been in good health, able to do heavy housework, and that she had not worked for them since the accident.

As we have noted, Dr. Weekes saw plaintiff on the 8th, sent her for X rays the following day, hospitalized her on December 21 for a myelogram, and it was his conclusion that she had suffered a ruptured intervertebral disc. He saw her approximately twice a week through May 1959 and once a month until the time of trial. His treatment consisted of sedation for pain, massage of the back muscles on occasion, heat treatments, and prescribing a lumbar brace. He testified that her injury was permanent and painful, that she would have pain in the future, and that a reasonable bill for his services was $600.

Dr. Allen, the radiologist, took X rays on two occasions, December 9 and December 21; the latter, after an opaque liquid had been injected into plaintiff's spinal column. His diagnosis was a rupture of the intervertebral discs between the bodies of the fourth and fifth lumbar vertebrae and the body of the fifth lumbar vertebra and the sacrum. He examined her again on June 8, 1960, just prior to trial and again took X rays. Those X rays showed a greater protrusion of the ruptured disc.

Dr. Arthur M. Jackson, an orthopedic surgeon, examined plaintiff on December 21, 1958, and performed a myelogram at People's Hospital. He found obstructions in the spinal column due to a ruptured intervertebral disc between the fifth lumbar vertebra and the first sacral vertebra and a partially ruptured disc between the bodies of lumbar vertebrae four and five. He examined her on January 10, 1960, and she

still complained of pain in the lower back and in the region of the lumbar sacral joint and right buttock and right thigh. She stated she experienced sharp pain in the lower back area on coughing or sneezing, and that prolonged sitting or standing aggravated the pain. She complained of intermittent swelling and tenderness of the right knee. Her movements were slow and deliberate. She walked noticeably bent forward and there was hardening of the lumbar sacral joint. Her forward bending was limited and side bending was limited 20 degrees to the right and 10 to the left. There was limitation of motion on straight-leg raising and there was a point of tenderness over the lumbar sacral area just to the right of the joint and that tenderness followed the sciatic nerve, the right ankle and knee jerks were diminished and not normal compared to the left, and he found the same narrowing in the intervertebral spaces. It was his conclusion that she suffered from ruptured discs between the fourth and fifth lumbar vertebrae and between the fifth lumbar and the first sacral vertebrae, that the condition was permanent and disabling in so far as accomplishing the kind of housework she had been doing, and that she would suffer pain and need medical care in the future.

We have examined the cases relied on by defendant to support its contention that the judgment as reduced is excessive. In Miller v. Multiplex Faucet Co., Mo., 315 S.W.2d 224, relied on by defendant, a verdict of $15,000 was reduced to $10,000 by this court. It was pointed out at 315 S.W.2d 229, that there "was no evidence tending to show the intervertebral processes were damaged or injury to the spine, other than the scoliosis as noted." In the present case, the evidence shows two ruptured discs. In Carpentier v. Middlewest Freightways, Mo., 259 S.W.2d 816, on which defendant relies, the jury returned a verdict for $20,000 and the trial court ordered a remittitur of $11,000. In the Carpentier case there was a ruptured disc between the fourth and fifth lumbar vertebrae with consequent narrowing of the intervertebral space; plaintiff favored the right leg on walking and there was a marked restriction of all the movements of the right hip and tenderness of the coccyx. Plaintiff was 41 and had been in good health. She received some other injuries as a result of the collision, such as head injuries causing bleeding from her ears, and an injury to her knee, hip, and back. She had employed extra help at $50 or $60 a week plus board. Plaintiff was nervous at the time of trial *but there was a sharp dispute as to whether many of the injuries were the result of the collision.* With respect to the verdict as reduced, the court said: "We have a situation before us in which if the trial court had not ordered a remittitur, it is doubtful that this court would have disturbed the verdict." 259 S.W.2d 820.

In Ukman v. Hoover Motor Express Co., Mo., 269 S.W.2d 35, decided in 1954, we approved a judgment in the sum of $15,000 for an injury to a 29-year-old man consisting of the rupture of an intervertebral disc between the fifth lumbar and first sacral vertebrae, where there was no evidence of special damages, and where the injured party had refused an operation.

In this case, plaintiff's special damages at trial time amounted to $4,378. We are of the opinion that we should not further reduce the amount of the judgment herein.

The judgment is affirmed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.