John MANTZ, (Plaintiff) Respondent,

v.

**SOUTHWEST FREIGHT LINES, INC.,**
a Corporation, (Defendant) Appellant.

No. 50076.

Supreme Court of Missouri,

Division No. 1.

March 9, 1964.

Motion to Transfer to Court En Banc Denied April 13, 1964.

Guilfoil, Caruthers, Symington & Montrey, John P. Montrey, Gerald M. Smith, St. Louis, for appellant.

Everett Hullverson, St. Louis, Terence M. O'Brien, Kansas City, Hullverson, Richardson & Hullverson, St. Louis, for respondent.

HYDE, Judge.

Action for damages for personal injuries, verdict for plaintiff for $300,000.-00; and after remittitur of $50,000.00 judgment was entered for $250,000.00. Defendant has appealed and has briefed two points: 1—Error in not granting defendant a new trial because of the failure of juror Gilliam to disclose on voir dire examination her pending claim against St. Louis Public Service Company; 2—The judgment as entered by the trial court is grossly excessive.

Plaintiff was driving a 1954 Ford pickup truck, with camper body, east toward Rolla on U. S. Highway 66, a divided highway, two lanes in each direction with a 40-foot median strip between, and was struck from the rear by defendant's 1956 International diesel tandem tractor coupled to a flat 58 Holland empty trailer. As to the issues on liability, defendant says: "Since the case involved a rear-end accident, the negligence of defendant's agent was not serious-

ly contested. However, the injured plaintiff was the driver of the car, and in view of defendant's driver's testimony that the plaintiff was operating his automobile at night in an unlighted condition, the question of contributory negligence was litigated. The evidence was clearly sufficient to warrant the submission of the issue of contributory negligence to the jury and the Court, finding that a jury case had been made on that issue, did submit it to the jury through instruction No. 3." The record supports this statement but plaintiff's evidence was that all his "lights were on and working good." There were also two reflectors on the rear of his truck.

■ As to its first point, defendant correctly says "where a juror intentionally conceals information sought on the voir dire examination, a new trial must be granted if liability is disputed." See Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, 463. Defendant claims "the facts in the record establish conclusively that juror Gilliam intentionally concealed her pending claim when interrogated on voir dire examination." This trial began December 3, 1962. On November 11, 1961, Mrs. Gilliam fell and sprained her ankle, stepping into a depression in the street, while alighting from a bus operated by the St. Louis Public Service Company. She said she used crutches for three weeks because of this injury. The insurance company which covered the bus company sent an adjuster to see her but by the time the adjuster had reached her she had already hired a lawyer and had had executed a contingent fee contract with a lawyer, which said he was "to represent her in a claim against St. Louis Public Service Company and the City of St. Louis."

On the voir dire, plaintiff's attorney, Mr. Hullverson, first stated it was quite important to know "whether anybody has ever been sued in any sort of lawsuit * * * or he may have sued somebody." He first asked if any juror "ever had a lawsuit filed against you * * * ever had a claim made against you"; and then asked, "Have you ever filed a lawsuit against anybody?" One juror said he had filed a suit about an automobile accident which was settled. Another juror said he filed a suit in a dog bite case in which he obtained a judgment. Plaintiff's attorney getting no further response then asked: "Now, has anyone else had any such experience, whether you have ever filed any suit, we will ask about the suit first and then we will ask about any claim? Have any of you filed a suit against anyone, or have any of you made any claims that didn't go to suit?" After no response and other questions, defendant's attorney asked plaintiff's attorney: "Did you ask if anybody ever had any claims that never went to court?" Plaintiff's attorney then said: "Yes, I wanted to know even the claims"; and a juror said he had made claims twice when his car had been hit and had settled both of them satisfactorily. Plaintiff's attorney then said: "So you had two claims. I want to make that very clear, because we want you to understand that we would like to know those things. Mr. Montrey would like to know, and I certainly would like to know. If you think of any claims, you might advise me as we go along." Thereafter, defendant's attorney asked: "Mr. Hullverson has asked you if any of you members of the panel have instituted suits in your own behalf or made claims in your own behalf. May I expand that question just a little bit, and ask you if any members of your immediate family have had suits or claims against some other person, and not telling me what you have already talked about to Mr. Hullverson." The only response was from the juror who had told about his automobile accident and who said his wife was with him on that occasion and was injured slightly.

At the hearing on the motion for new trial, Mrs. Gilliam said this was her first jury service and testified as follows: "Q. Did you at that time have a claim of any kind? A. I didn't know if I had one or

not. Q. Do you remember a claim when I asked this question generally, did you remember anything about the claim? A. No, sir. * * * Q. Mrs. Gilliam, when Mr. Hullverson asked these people about claims, did you understand what he meant by a claim? A. Well, it was like people were going up to court any time of this month or then. That is what I understood, yon know — Q. You understood that when he said claim, he meant people that were going to court this month? A. Yes. * * * Q. Did you think claims were different from lawsuits? Or the same thing? A. Different. Q. When you thought you had a case against the streetcar company what did you think that was? A. I thought, well, I don't think they ever filed for it, so I never heard nothing about it since. Q. Did you think you had a claim against the streetcar company? A. No. * * * I never thought about it when I was on the jury."

Mrs. Gilliam said she had telephoned her lawyer's office several times without reaching him but had not seen him since she signed the contract and had last talked to him on the phone in August 1962. Her lawyer said he sent a lien letter to the Public Service Company but never discussed settlement. He said: "The last discussion I had with her * * * I told her that I didn't know whether we would be able to get anything or not, and I didn't feel that it was a case that warranted filing a lawsuit. * * * And I told her at that time that I didn't feel that it was a claim or a case that warranted filing a lawsuit."

■ "Whether a verdict shall be set aside for failure of a venireman to disclose some fact on voir dire which might reasonably affect his qualification to sit as a juror is a matter primarily within the sound discretion of the trial court, Hornberger v. St. Louis Public Service Co., Mo.Sup., 353 S.W.2d 635, 642, whose action is conclusive 'unless an abuse of discretion unmistakably appears.' Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795." Begley v. Adaber Realty & Investment Co., Mo.Sup., 358 S.W.2d 785, 792. See also Barb v. Farmers Insurance Exchange, Mo.Sup., 281 S.W.2d 297; Davis v. Kansas City Public Service Co., Mo.Sup., 233 S.W.2d 679. If the trial court is justified in finding there was no intentional concealment, misrepresentation, deception or prejudice, no abuse of discretion can be found. In Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, 464, the juror involved had made 40 or 50 claims and had one pending against the defendant at the time over a collision of his car with a streetcar because of which he was fined in police court and about which he had the feeling he had been "railroaded". We said: "The plain and only reasonable inference from this record is that juror Prince intentionally concealed the fact, after direct examination on the subject, that in 1943 and 1944 he had a claim against the appellant. In the circumstances 'it is difficult to conceive how that could be harmless error.'" Refusal to grant a new trial in that case clearly was an abuse of discretion. For another case in which we held a new trial should have been granted (because of a juror's indicated prejudice) see Moore v. Middlewest Freightways, Inc., Mo.Sup., 266 S.W.2d 578; and for other cases finding abuse of discretion in not granting a new trial where intentional concealment appeared see Brady v. Black and White Cab Co., Mo.App., 357 S.W.2d 720 (juror did not answer because he did not remember details); Triplett v. St. Louis Public Service Co., Mo.App., 343 S.W.2d 670 (juror made direct false negative answer). In other cases cited by defendant, Woodworth v. Kansas City Public Service Co., Mo.Sup., 274 S.W.2d 264; Girratono v. Kansas City Public Service Co., Mo.Sup., 272 S.W.2d 278, the trial court granted a new trial, this action being affirmed on appeal. As we said in the Woodworth case (274 S.W.2d 1. c. 271): "[A]ppellate courts are more liberal in

upholding a trial court's action in sustaining a motion for a new trial than in denying it." In the first place, Mrs. Gilliam's claim was not against the defendant as in the Piehler case. Since it appears that Mrs. Gilliam had been told by her lawyer several months before the trial that filing a lawsuit was not warranted, she reasonably might not expect to get anything for her injury which was not severe; and this could explain her statement that she did not know whether she had a claim or not. Moreover, the jurors who answered the voir dire questions told only about claims that had been sued on or settled. Furthermore, neither lawyer in the voir dire questions mentioned personal injuries in asking about suits and claims. We said in the Barb case (281 S.W.2d 1. c. 302): "Our careful examination of the testimony indicates that these veniremen did not precisely understand what it was counsel meant by the word 'claim,' or had for the moment forgotten the accidents in which they had been involved." Our conclusion is that the trial judge reasonably could have so found in this case and therefore we find no abuse of discretion in overruling the motion.

■ As to the excessive verdict contention, the following facts appear: Plaintiff was 44 years old at time of trial and had long experience and high reputation in automobile racing. He began, at about 21, as a professional midget auto racer, 1939 and 1940, then joined the Canadian Army and later transferred to U. S. Army from which he was discharged in June 1943 for disability due to auto racing accidents. The injuries noted on the army report were head injuries due to concussion, causing headaches, vertigo, and spells of unconsciousness; and fracture of the third lumbar vertebra. Discharge was because these conditions prevented "further useful service from soldier." Plaintiff continued midget racing until 1948 and then began big car racing. In 1947, he sustained a compression fracture in the lower part of his spine and had it fused; and in 1955 cracked a bone in his neck for which he wore a collar for about three weeks. In 1948, he qualified and drove in the Indianapolis race and in 1949 ran seventh in that race, driving the 500 miles without relief or stop, breaking several records and winning substantial prize money. During these years he won the West Coast Big Car Championship and was second in the Eastern Big Car Championship. In 1950, he began stock car racing, first with Nash and in 1952 with the Ford Motor Company team, for advertising and promoting Ford cars through 1957 when motor companies ceased sponsoring stock car racing. In 1955, plaintiff received $9,000.00 annual salary with 60% of prize money and all expenses. By 1957 he was receiving $1,000.00 per month salary in addition to prize money and pay for additional engineering tests. By 1952, he also had income from his Mantz Company, "furnishing and distributing perishable cutting tools to aircraft companies," for which he was outside salesman. He also had an interest in the George Holland Company, a machine shop, during part of this period. In 1956, plaintiff's total earnings were $27,188.00, of which $12,400.00 was derived from the Mantz Company and $14,000.00 from DePaolo (Ford). His gross income in 1957 was $42,000.00, made up of $9,000.00 from Stroppe & Associates (Mercury), $15,000.00 from the Mantz Company, and $18,000.00 from the George Holland Company. In that year his net taxable income was $26,080.00. In 1958 his net taxable income was $17,520.00, and his gross was $26,000.00, of which $18,000.00 was received from the Mantz Company and $8,000.00 from the Holland Company. In 1959, his net taxable income was $19,130.00 and in 1960 it was $12,276.00.

In 1960, the Mantz Company went out of business because of changes in defense business from airplanes to missiles and the cancellation of the B–70 program for which his company had developed tools. Plaintiff's income in 1961 dropped to $10,000.00 mainly for promotional work for an Engineering Company and for Ford. How-

ever, in 1961, plaintiff developed a plan for a one-unit motor home to use a Ford chassis, to be called the Condor Motor Home and sold through Ford dealers. He made arrangements with a California engineering company to build a model in Detroit under Ford supervision and get it in 1962 automobile shows, for which he was to be paid a salary of $1,450.00 per month with a per diem for expenses. He was on his way to Detroit for this purpose, with A. R. Smith, a mechanic, hired by the engineering company to go with him, when he was injured. After plaintiff's injury this Condor project model was completed and the unit shown at the 1962 New York automobile show. It was also shown that Ford had plans to enter racing competition in 1962 and its contractor, who selected the drivers and for whom plaintiff had previously driven, said plaintiff had all the qualifications he was looking for in his drivers.

After the collision, January 11, 1962, plaintiff was taken to a hospital in Rolla and the next day to Barnes Hospital in St. Louis. He was in a semi-comatose condition and near death from profound shock and loss of blood. His left arm had to be amputated above the elbow and, because of injuries to shoulder muscles on both sides, it is difficult for him to wear and use an artificial arm. He had a fracture in his right foot and the right hip and multiple comminuted fractures of the femur. At the time of the trial, December 1962, the fractures in his foot and hip had healed but there was limitation in the hip joint of about one-third. However, the fractures of the femur had not completely healed and he was required to wear a leg brace so that he would not put any weight on it. In the femur fractures there was some necrotic or dead bone which the doctors considered dangerous to remove and which could cause serious trouble if it became infected. The chances of healing were favorable although the leg would be bowed and almost two inches shorter than the left leg and probably require the use of a cane. There was a loss of about 70 degrees of flexion at the knee.

Plaintiff has permanent scars on his face, one about three inches long, another an inch and a quarter and several smaller ones. He lost all of his lower teeth (he wore a full upper denture) and his tongue was split into two parts. He also sustained fractures of facial bones, nose and jaw and had six rib fractures on the left side and two on the right. Both lungs were punctured by rib fragments and partially collapsed. Tubes had to be inserted in each side of his chest for air to pass out through the torn portion of the lung and traction used by pulleys and weights to hold the chest distended. The lung injuries left pleuritic adhesions, loss of volume and susceptibility to infection. Plaintiff suffered much pain from these injuries. At first he had a kidney failure and for a long time a catheter was kept in his bladder. He also had a blood clot, thrombophlebitis, in his left leg. For several months, plaintiff could not keep food down and had to be fed through the veins. It was later discovered that plaintiff had a fracture of the process of the second lumbar vertebra, bleeding from which had probably caused a baseball-size mass found behind his stomach which displaced it forward delaying it from emptying.

Plaintiff was in Barnes Hospital until March 12th and then moved in a full body cast to a California hospital where he stayed until June 16th. He then came back to Barnes for six weeks for occupational therapy and instruction in the use of the artificial arm. Plaintiff's special damages were $24,000.00 for hospital and medical expenses, $1,000.00 for loss of automobile and tools, lost wages 11 months at $1,450.00 per month $15,950.00, a total of $40,950.00. Plaintiff's life expectancy table showed expectancy at his age of 28.56 years and an actuary stated that the "present value of 10,000 a year payable monthly, for a period of 22 years, is $161,113.88" (to age 65 for plaintiff) at 3%, figured from

the year of plaintiff's lowest recent earnings. Defendant argues the effect of previous injuries plaintiff had sustained as recited in his discharge from the army and also his later injuries. However, his activities and career, for more than 18 years after his army discharge, indicate considerable recovery from these old injuries; and also from the later one which required a spinal fusion operation. Plaintiff's ability and reputation as an auto racer made it possible for him not only to obtain a large income from that activity but also opened opportunities in promotion and sales work for automobile manufacturers and engineering companies. Much of this depended on ability to demonstrate their products by driving over the country or appearing on television doing so. Plaintiff's sales activities also depended on much driving and walking through factories, which the jury reasonably could find he will not now be able to do. Certainly plaintiff suffered very severe, painful and permanently disabling injuries, which will require future medical services, and he will continue to suffer pain as well as inability to carry on the activities that have produced for him a very good income for many years. Defendant cites Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697, in which we affirmed the judgment of $100,000.00, after a remittitur of $50,000.00 had been ordered by the trial court; Newman v. St. Louis-San Francisco Railway Co., Mo.Sup., 369 S.W.2d 583, in which we ordered a remittitur of $90,000.00 to reduce a judgment of $225,000.00 to $135,000.00; and Moore v. Ready Mixed Concrete Company, Mo.Sup., 329 S.W.2d 14, in which we affirmed the judgment for $150,000.00 after a remittitur of $50,000.00 had been ordered by the trial court. Defendant says the similarity of the injuries in the Moore case and in this case are great; but it points out that Moore was 34 while plaintiff here was 44 and says that plaintiff has made a better recovery than Moore had. However, Moore's earnings had been less than $400.00 per month while plaintiff had a contract for a salary

of $1,450.00 per month with prospects for greater earnings from the project on which he was working and further prospects in stock car racing. Moreover, plaintiff had been earning a comparable amount for all but one of the previous six years. Thus it appears that plaintiff's loss of earning capacity is much greater than Moore's.

In the Myers case, plaintiff was 65 years old, earning from two to three thousand annually but was totally incapacitated by his injuries, probably requiring continuous nursing attendance the rest of his life. The Newman case also involved a totally incapacitated plaintiff, a mentally retarded, epileptic boy who never could have had any earning capacity. Thus these cases are not comparable to this one. Both parties agree on the following statement: "Clearly, there is no precise formula for gauging whether a verdict is excessive. Each case by its very nature must depend upon its own facts and consideration must be given to the nature and extent of the injuries and losses, the earning capacity of the plaintiff before and after the injury, the plaintiff's age and the amount of compensation awarded and approved in cases similar or comparable. Of course, the ultimate test of excessiveness is what will fairly and reasonably compensate for the injury sustained." See Honeycutt v. Wabash R. Co., Mo.Sup., 337 S.W.2d 50, 56; Parlow v. Carson-Union-May-Stern Company, Mo.Sup., 310 S.W.2d 877; Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681–682. This court "in determining the maximum amount authorized by the evidence, does not award or fix the damages but only says that if the jury had given such maximum amount then its verdict could have properly been permitted to stand," Counts v. Thompson, 359 Mo. 485, 222 S.W.2d 487, 495. Our view is that the jury reasonably could find that plaintiff is totally and permanently disabled from engaging in his previous occupation and activities which rewarded him with such a much better than average

income and that his ability to engage in any work for which he might be qualified is entirely speculative. "Where, as here, the trial court has considered the question of excessiveness and ordered a substantial reduction, we are usually reluctant to order a further reduction." Moore v. Ready Mixed Concrete Company, 329 S.W.2d 1. c. 32. Nevertheless, considering the effect of plaintiff's previous injuries both before and after his army service, the extent of his recovery and our rule of reasonable uniformity, our conclusion is that the verdict is still excessive by $50,000.00.

Therefore, if plaintiff will remit $50,-000.00 within fifteen days, the judgment will be affirmed as of the date of its rendition for $200,000.00; otherwise the judgment will be reversed and the cause remanded for a new trial.

All concur.