Ethel BRADY, Plaintiff-Respondent,

v.

BLACK AND WHITE CAB COMPANY,
Defendant-Appellant,
and
Juanita Pantoja, Defendant-Respondent.

No. 23529.

Kansas City Court of Appeals.

Missouri.

April 2, 1962.

John R. Gibson (Morrison, Hecker, Cozad & Morrison), Kansas City, for appellant.

Keith K. Couch and James L. Williams (McKenzie, Williams, Merrick, Beamer & Stubbs), Kansas City, for respondent-defendant.

Paul H. Niewald (Sanders & Niewald), Kansas City, for respondent.

HUNTER, Presiding Judge.

This litigation arises out of an intersectional collision in Kansas City between a Ford automobile being driven by defendant-respondent, Juanita Pantoja, and defendant-appellant, Black and White Cab Company's taxicab being driven by Irvin Gordon. On the afternoon of December 18, 1959, plaintiff-respondent, Ethel Brady, was a passenger in Mrs. Pantoja's automobile traveling east on 19th Street when it collided with defendant's vehicle southbound on Walnut Street. The impact occurred in the intersection of 19th and Walnut Streets. There was a traffic light in operation there at the time.

Plaintiff brought suit in the Circuit Court of Jackson County against both her driver, Mrs. Pantoja, and the taxicab company. The jury found the issues for Mrs. Pantoja and against the taxicab company in the sum of $8,000.00. Judgment was entered accordingly.

Thereafter, a motion for new trial was duly filed on behalf of defendant-appellant taxicab company. Before this motion could be heard the trial judge before whom the case had been tried became ill, and it was necessary for the motion to be heard by another judge of the circuit court properly assigned for that purpose. This judge overruled the motion and the taxicab company has appealed.

In view of the disposition we make of this appeal, a brief statement of the facts concerning the collision will suffice.

Plaintiff testified she was traveling east on 19th Street in Mrs. Pantoja's car, and when the car in which she was riding was about a half block back, traveling at a constant speed of 20 miles per hour, the traffic signal light at 19th and Walnut was green for eastbound traffic. She saw this light turn amber as the car reached the west line of the crosswalk (the 19th Street crosswalk on the west side of the intersection). When the car had gone into the intersection "a little less than halfway" she saw the taxicab coming up to the crosswalk lines on Walnut at a constant rate of speed of at least 25 to 28 miles per hour. The taxicab was in the third lane to the east as it reached the intersection, and when the cab driver "got very close to us, (not more than 5 or 6 feet) he looked up and had a very surprised look on his face." Neither car slowed down, braked, or turned and the cars collided when the front of Mrs. Pantoja's car was just a few feet short of the crosswalk lines on the east side of 19th Street. "Q. And it (taxicab) came against the red light? A. Yes." Right after the impact she glanced up and the light for eastbound traffic on 19th Street had changed from yellow to red.

It was Mrs. Pantoja's testimony that when she was about a half block away and proceeding at 20 miles per hour east on 19th Street toward Walnut the traffic light at 19th and Walnut was green for eastbound traffic. When she was between 4 to 6 feet east of the west curb line of Walnut Street the light turned yellow. She proceeded on with unchanged speed and unchanged direction to the point of impact near the middle of the intersection. She did not see the cab prior to the collision. She stated the light for eastbound traffic did not turn red while she was in the intersection before the collision. On cross-examination she stated she did not know what the color of the light was at the time of impact.

The driver of the taxicab, Irvin Gordon, testified that he was going 20 miles an hour south on Walnut, a four lane one way street, in the third lane to the east and that he never moved out of that lane. The traffic light in question was green for him when he was 20 feet beyond the intersection at 18th Street headed toward 19th Street. He entered the 19th Street intersection on the green light, and it was still green after the impact. He never saw the Ford car until he was about 5 feet from it. At that time he was "around the middle of the intersection." He never changed his speed or direction.

Carl Felt, an independent witness, testified on behalf of defendant Cab Company that he was driving south on Walnut behind the taxicab; that the taxicab approached and entered the 19th Street intersection on the green light, and that it remained green until after the impact.

Ruth Montoya, sister of Mrs. Pantoja, also a passenger in the Ford car, testified the traffic light was green for eastbound traffic on 19th Street as they approached the 19th Street intersection. She did not again observe it.

Ruth Chacon (now deceased) a passenger in another car and a witness to the accident, testified, by deposition. In a rather unclear fashion she stated that at the time the cab started into the intersection the light was red (for the taxicab), and after Mrs. Pantoja's car was in the intersection the light changed.

The first question before us is whether the judge who heard the motion for new trial erred in refusing to grant a new trial on the ground that Juror Ralph M. Jones on voir dire examination intentionally failed to truthfully answer certain questions and to disclose information concerning claims and lawsuits asserted by him and his wife. Appellant Cab Company contends there was intentional concealment of this information; that such concealment demonstrated bias and prejudice on the part of the juror, and resulted in the Cab Company being deprived of a jury composed of twelve fair and impartial persons.

A summary of the more pertinent portions of the voir dire examination is in order. At the commencement of that examination plaintiff's counsel told the panel, "Now, as I ask these questions (concerning your qualifications to sit on this jury), or if any of the attorneys ask these questions, don't hesitate if it requires an answer to raise your hand and let us know, because we have to ask these questions to determine your qualifications. The reporter, of course, is taking this down, so it would help us if you would answer frankly, and if you have any questions, if you are not sure that the answer is in the affirmative or not, let us know, so that we can go into the matter, because this is important. If you don't answer these questions or if it doesn't get into the record and then later something would be found about that, it could upset the whole trial." Thereafter, plaintiff's counsel asked, "whether there are any members of the jury panel who have ever been a plaintiff in a lawsuit? In other words, the plaintiff is a party bringing the lawsuit against someone else." Several of the panel responded, advising of lawsuits in which they had been plaintiffs and they were examined about those cases. Then the question was repeated, and plaintiff's

counsel added, "Now, if you are not sure what a plaintiff is, and you think you may have been a plaintiff, don't hesitate to let us know, because we want to inquire into these things, and we want the record to be straight on it?" Throughout all of this Juror Jones remained silent.

The next questions were limited to "where you have been involved in an automobile accident and made a claim", etc. Thereafter, counsel asked: "Have you or any member of your immediate family ever been the plaintiff in a personal injury lawsuit?" Juror Jones remained silent. The following question was, "Any person who has had a member of your immediate family as a plaintiff in a personal injury lawsuit?" Several others on the panel responded to this question which was from time to time repeated but Juror Jones remained silent. The next question was, "Anyone else? Either them personally or a member of your immediate family had a lawsuit for personal injuries?" Juror Jones made no response.

Near the close of the lengthy voir dire examination, the question asked was, "Is there any one else who has been searching their memory for the last few questions who recalls any circumstance under which they or any other members of their family may have been a plaintiff in a personal injury lawsuit?" Juror Jones remained silent. The next question was, "Have you or any member of your immediate family ever had a claim for personal injuries which did not necessitate the filing of a lawsuit, simply a claim made and either settled or denied?" One panel member answered, but Juror Jones continued to remain silent. Twice, thereafter, the panel was asked "Anyone else who has had a claim or any member of your immediate family." Several members of the panel volunteered information but Juror Jones remained silent.

The final question on this subject was, "I take it by your silence, then, that we have now covered all persons who have been plaintiffs or had claims or workmen's compensation claims?" Additionally, the panel was inquired of, "Now, have you or any member of your immediate family ever sustained through any cause an injury to your neck region? Any person on the panel, either personally or any member of your family, that sustained an injury to the neck?" Although one panel member spoke up, Juror Jones did not.

At the hearing on the motion for new trial filed by defendant-appellant Cab Company evidence to the following effect was adduced: Mr. Thomas E. Deacy, a Kansas City attorney, stated that as a result of an automobile accident which occurred on July 1, 1953, he filed on behalf of a Mr. Bigler a suit against Mrs. Ralph M. Jones, wife of the panel member, and Mrs. Jones filed a counterclaim against Mr. Bigler for $25,000. Her alleged injuries were of a serious nature and included serious injury to her neck. Then a separate suit was filed on behalf of Ralph M. Jones for $15,000 against Mr. Bigler wherein Juror Jones sought recovery of damages by reason of his wife's alleged injury. The circuit court files concerning these two suits were introduced in evidence. These cases were settled in 1957 and dismissed on separate executed stipulations. The sum of $4,300 was asked as consideration for the settlement release. On the basis of a serious question as to any liability on the part of Mr. Bigler the settlement sum of $800.00 was agreed to and paid to Mr. and Mrs. Jones and their attorneys by a check made out in all of their names as payees. This check was later endorsed by them and cashed. The releases were prepared by Juror and Mrs. Jones' attorneys and were executed by Evelyn L. and Ralph M. Jones. Mr. Bigler executed a similar release, releasing Evelyn Jones and Ralph M. Jones. These releases are in evidence.

The hospital records concerning Mrs. Jones' hospitalization as a result of her accident are in evidence. They indicate she was hospitalized on July 15, 1953, and was released as "improved" on July 25, 1953. Her injuries included brain concussion,

bleeding from left ear, severe pain in head, injury to neck and shoulder and visual disturbances.

In her deposition taken on July 20, 1954, in connection with both her suit and the separate suit of her husband against Mr. Bigler, Mrs. Jones stated: On her doctor's orders she eventually had to quit her employment because of her injuries resulting from the accident, later combined with pneumonia. She had visible arm, elbow, shoulder and leg bruises from some time after the accident, and a big knot on her head. After leaving the hospital she remained at home two or three weeks, and then went back to work until she got pneumonia. As a result of her injuries from the accident, particularly headaches, she was unable to do her housework and her husband and children have had to do it for her since the accident to the date of the deposition. She still has severe and violent headaches six days out of the week. Some last three days without interruption. She can't lift anything heavy without triggering head pain. Once she even blacked out from such pain. When her head hurts her neck aches. The financial strain from the accident has cut their financial standard of living severely. "Sometimes we eat pancakes for four days in a row; my children have had no pleasures, they can't go swimming, picture shows or anything, that normal children do. And its meant that they had to go without the proper clothing. At times that they needed it. And it has been a lot of hardship." Her husband personally paid all her numerous bills for prescriptions, medicine and medical services. Title to the car in which she was riding was in her husband's name and it was repaired. Mrs. Jones' husband was called to the scene of the accident; took her to the police station where he put up a $50.00 bond for her; took the car to the garage for repairs which cost several hundred dollars, of which sum he paid $50.00.

It is noteworthy that Mrs. Jones' accident was the result of an intersectional collision involving a stop sign and right-of-way contentions.

George T. O'Laughlin, Kansas City attorney, testified he was one of the attorneys who represented Mr. and Mrs. Jones in the suits involving Mr. Bigler. He stated that during the pendency of those lawsuits he talked with Juror Jones "three times in person, and at least one time over the phone." He personally knew his associate took Mr. and Mrs. Jones by the scene of the accident on another occasion. His first conversation with Juror Jones was by telephone to determine how title to his car was held "so that we could make a claim on behalf of his insurance company". Juror Jones was the named insured. He had discussions with and informed Mr. Jones there was a lawsuit pending for his wife's injuries and also a lawsuit "for Ralph Jones for loss of services." On another occasion at Mr. Jones' home Mr. O'Laughlin in the presence of Mr. Jones discussed with Mr. Jones and Mrs. Jones her medical history as it related to the accident he was representing her in. The subject "of a lawsuit for both husband and wife" was discussed with both of them. "Q. Did you have authority to file a lawsuit for Ralph M. Jones? A. Yes." On another occasion he and his associate counsel "went over and discussed immediate trial preparations with Mr. Jones and Mrs. Jones and generally what our trial plans were." The settlement proceeds were paid to both Mr. and Mrs. Jones.

Ralph M. Jones testified at the hearing on the motion for new trial. He identified himself as a member of the jury and had taken the customary oath to tell the truth on the voir dire examination. He understood the questions asked on that occasion were for the purpose of determining his qualifications as a juror in the case. He heard the numerous questions asked regarding whether he had ever had a lawsuit or a claim and whether any immediate member of his family had ever been the plaintiff or defendant in a lawsuit or had had a claim. He understood the questions but did not

respond to them. His explanation was that "as far as my memory goes, I have never had a lawsuit and at the time something—well, I guess that I had known that the wife had had one, but I had nothing to do with it, and I received no money; as far as I know, I didn't sign anything." At the times the questions on voir dire were asked, "I knew she had had an accident. I didn't recall whether she had a lawsuit or just what happened. I didn't know the disposition or what happened in the case at all." In answer to another question he acknowledged that at the time the jury was being selected he did know his wife had had a claim and lawsuit. "Q. And you didn't answer and tell anything about the claims or lawsuit? A. Well, I felt like that I wouldn't be able to answer any questions on it; I wouldn't be able to tell you how it came out." * * * "It was just out of my mind."

Mr. Jones admitted it was his signature on the mentioned release. He stated he did not recall if his wife had been hospitalized after the 1953 accident. "Q. And she had trouble with her injuries for a period of time following that? A. I don't know whether it was due to the accident or not." * * * "Q. And that accident caused some financial hardship in your family, did it, Mr. Jones? A. I don't know that it was any different than any other time." He conceded he and Mrs. Jones might have discussed their claims "but I don't remember whether we talked about it or not." He denied he had any bias in the case or bias resulting from the earlier claims and suits of his and his wife.

▇▇▇▇ The law governing the question presented is well settled. It is only its application that is sometimes difficult. The constitutional right of every citizen to a trial by jury to be meaningful contemplates a fair and impartial jury. The jury should consist of twelve impartial, qualified jurors. Even though three-fourths of them can decide a civil case, parties are entitled to have that decision, whether for them

or against them, based on the honest deliberations of twelve qualified jurors. Lee v. Baltimore Hotel Co., 345 Mo. 458, 136 S.W. 2d 695, 127 A.L.R. 711.

▇▇ ▇▇ It is the duty of a juror on voir dire examination to fully, fairly and truthfully answer all questions directed to him so his qualifications may be determined and so that challenges may be intelligently exercised. It makes no difference whether the unanswered or untruthfully answered question was one asked to the panel generally or to the particular juror individually. So long as he hears the question and understands that it calls for an answer by him as a member of the panel, even though it may be directed to the panel generally he is not relieved of his duty to answer. In Gibney v. St. Louis Transit Co., 204 Mo. 704, 103 S.W. 43, 47, it is phrased, "* * * it was enough to ask such a question as would indicate to the mind of a fair and reasonable man what information the examining counsel sought to elicit." To rule differently would make a mockery of his solemn oath and duty to respond truthfully to pertinent questions touching upon his qualifications as a juror. It would also result in all questions having to be asked individually of each member of the panel and thus needlessly prolong voir dire examinations by in effect abolishing the time honored practice of putting questions to the entire panel.

▇▇▇ Nor does the fact that the particular juror believes he no longer remembers the details of a prior suit or claim relieve him of the duty to state he had a prior lawsuit or claim, if when the pertinent question on voir dire is asked he remembers he had such a claim or lawsuit. He must respond to the question in good faith as best he can, and if he cannot recall details he can truthfully state that to his interrogator.

▇▇▇ A juror's *intentional* concealment of a material fact may compel the granting of a new trial. Woodworth v. Kansas City

Public Service Co., Mo.Sup., 274 S.W.2d 264. This for the reason that his conduct reveals he is not truthful and the intentional concealment of a material fact is strong evidence of bias and prejudice which will affect his conduct as a juror as well as his qualifications.

■ The accepted rule is that it is for the trial court in the exercise of its sound judicial discretion to determine upon hearing whether or not in the particular instance the juror is guilty of an intentional concealment of a material fact or had merely forgotten the earlier event; and, thus to decide whether or not a new trial should be granted. Logsdon v. Duncan, Mo.Sup., 293 S.W.2d 944; 38 A.L.R.2d 624, 631.

In Triplett v. St. Louis Public Service Company, Mo.App., 343 S.W.2d 670, the appellate court held the trial court abused its discretion in not granting a new trial for the deliberate failure of a juror to disclose pertinent information on the voir dire examination. As there stated, loc. cit. 673: "In the final analysis, therefore, the question of what result should follow the failure of a juror to correctly answer a question touching his qualifications depends upon whether or not he was guilty of an intentional concealment. Primarily, the determination of that question must be left to the sound discretion of the trial court. Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795. Nevertheless, the exercise of such a discretion is subject to judicial review, and if an appellate court concludes from the record that an abuse of discretion unmistakeably appears, it is its duty to reverse the ruling. Piehler v. Kansas City Public Service Co., supra [357 Mo. 866, 211 S.W.2d 459]; Harrison v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 348."

In Girratono v. Kansas City Public Service Company, Mo.Sup., 272 S.W.2d 278, 281, it is said, " * * * In considering cases which have discussed this question, it should be kept in mind that a different rule obtains when a motion for new trial has been sustained than when it has been overruled. The appellate courts are more liberal in upholding a trial court's action in sustaining a motion for new trial than in denying it, and the language of the courts in approving the action of a trial court should be read with this distinction in mind."

As stated in Wallace v. Whitzel, Mo. App., 324 S.W.2d 157, 160: "An abuse of the judicial discretion vested in the trial court results when there is rendered an erroneous conclusion in judgment, one that is clearly against logic and the effect of facts before the court or the reasonable, probable and actual deductions to be drawn from such facts and circumstances."

The fact that Juror Jones stated he had forgotten his own claim and lawsuit, and that the reason he did not disclose his wife's claim or lawsuit was because at the time of the voir dire examination he didn't have enough memory of it to answer questions about it did not require the trial court to believe such statements. The court was not bound to accept his statement as true or his explanation to be in good faith and thus to conclude there was no intentional concealment by him of a material fact.

■ Upon the record before us and before the judge (not the trial judge) who overruled the motion for a new trial, we conclude that it was an abuse of sound judicial discretion to fail to grant the motion. As stated in the case of Girratono v. Kansas City Public Service Company, supra, loc. cit. 281: "When the above * * facts are considered, it would tax the credulity of the most naive person to believe he had merely forgotten about such matters. The trial court was not required to believe the bland statement of (the juror) that he had forgotten such suits. All the facts and surrounding circumstances must be considered in determining that issue. A prospective juror is not the judge of his own qualifications."

In Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 399, 116 S.W.2d 27, 29,

our Supreme Court said, "Where there is a dispute as to liability, and an objectionable juror is permitted to try the case, it is difficult to conceive how that could be harmless error, unless waived by the losing party, even though there be a unanimous verdict."

■ Although we have determined that a new trial is necessary for the reasons given above, we deem it prudent to mention another of appellant's contentions of error. Appellant claims that Instruction No. 1 was erroneously given for the reason, among others, that the instruction is based on evidence in conflict with plaintiff's own testimony. We have concluded that there is merit in this contention. The verdict directing instruction submits on behalf of plaintiff a situation in which the taxicab entered the intersection on the *green light* but its driver failed to keep a proper lookout, and in the disjunctive also submits a situation in which the taxicab entered the intersection on the *red light* and hence failed to yield the right-of-way. Plaintiff's testimony, which we have set out above and as we understand it, is that the taxicab entered the intersection on the *red light*. In view of earlier rulings of our Supreme Court we do not believe plaintiff is entitled to instruct on a hypothesis directly contrary to her own positive testimony. See, Giambelluca v. Missouri Pacific Railroad Co., Mo.Sup., 320 S.W.2d 457–474; Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869, 874; Trump v. Ballinger, Mo.Sup., 317 S.W.2d 355, 359; West v. St. Louis-San Francisco Ry. Co., Mo.Sup., 295 S.W.2d 48. If we are mistaken as to what plaintiff intended by her testimony she will have an opportunity on new trial to more clearly state her personal knowledge concerning the color of the traffic light as the taxicab entered the intersection.

Appellant-defendant Cab Company in its motion asked for a new trial as to the issues between plaintiff and defendant Cab Company *or* a new trial as to all parties and all issues. The Cab Company suggests this court should grant a new trial as to all parties, including defendant-respondent Pantoja in whose favor the jury found, for the reason that the misconduct of the juror would relate to all parties. Plaintiff-respondent makes the same suggestion so as to avoid a possible situation where upon retrial the jury might believe Mrs. Pantoja was the responsible party thereby defeating plaintiff's recovery, citing Civil Rule 78.01, V.A.M.R., and the cases of Hicks v. Shanabarger, Mo.App., 236 S.W.2d 49, and Neal v. Curtis & Co. Mfg. Co., 328 Mo. 389, 41 S.W.2d 543, 545. It is noteworthy that plaintiff-respondent Brady did not file a motion for new trial as to defendant-respondent Pantoja, nor take an appeal from the judgment rendered. Essentially the question presented is whether one of two defendants may successfully complain of a juror's misconduct, or any trial error, other than one affecting the losing defendant's defenses. There is no contention that plaintiff's right of recovery was limited to a judgment against the defendants jointly.

Research by the parties and this court has not produced a case directly in point. However, we think certain accepted considerations indicate the lack of merit in the contention. A plaintiff may sue any or all wrongdoers contributing to his injury. This plaintiff could have selected the Cab Company as the sole defendant and the Cab Company could not successfully complain that defendant-respondent Pantoja was not included in the suit. Plaintiff could have dismissed as to defendant Pantoja at the close of all the evidence and defendant Cab Company could not meritoriously complain. Defendant Pantoja's motion to dismiss at the close of the evidence could have been improperly sustained by the court and the Cab Company could not thereafter successfully complain of that action.

■ Here, plaintiff-respondent Brady cannot successfully complain because she did not file a motion for new trial, nor take an appeal from the judgment rendered, which judgment was in accordance with

the verdict in favor of Mrs. Pantoja. While it is true that *if* Mrs. Pantoja had received an adverse judgment and had been the appellant and plaintiff the respondent, plaintiff *as between them* could timely assert her contentions of error even though plaintiff had not appealed, (See, Wilhelm v. Haemmerle, Mo.Sup., 262 S.W.2d 609.) this is not the same as permitting a non-appealing plaintiff to assert in the appellate court contentions of error against a defendant who also is not appealing. If plaintiff had wished to keep defendant Pantoja in the case she should have filed the usual motion for a new trial complaining of the verdict and judgment for defendant Pantoja and have appealed from the judgment after the adverse ruling on the motion. Not to do so is to abandon any personal right to keep that defendant in the case and to permit the judgment as to that defendant to become final.

■ We have also concluded that defendant-appellant Cab Company cannot successfully complain of the jury's verdict and resultant judgment in favor of his co-defendant and against plaintiff where the tort claim asserted is both joint and several in nature. Civil Rule 78.01 permits granting new trials "for any of the reasons for which new trials have heretofore been granted" and "on motion of the proper party". It provides, "a new trial may be granted to all or any of the parties * * *." We know of no case prior to or after Civil Rule 78.01 holding that one defendant can successfully complain of a jury verdict and judgment in favor of a co-defendant when the claim asserted against them was joint and several in nature. We do not believe Civil Rule 78.01 contemplates, where the tort claim is joint and several, that a co-defendant is a "proper party" to obtain a new trial for, or to include, the other defendant who is satisfied with the trial and judgment. Our view accords with the fundamental theory that on an appeal a party is entitled to assert only his personal rights, and cannot complain of the court's action toward another party not involving any right of the one complaining. Cf. Kansas City v. Cain, Mo.App., 319 S.W.2d 266(6). Certainly defendant-respondent Pantoja is not complaining that Juror Jones was prejudiced against her and she is not dissatisfied with the jury verdict and judgment.

We refrain from any consideration of other numerous allegations of error concerning instructions, weight of the evidence, and alleged excessiveness of the judgment. These matters are not likely to arise again in view of the enlightenment contained in the briefs and the opportunity of a new trial.

The judgment is reversed and the cause is remanded for a new trial between plaintiff-respondent Brady and defendant-appellant Black and White Cab Company. It is so ordered.

All concur.