**Wilma DALTON, Plaintiff-Respondent,**

v.

**KANSAS CITY TRANSIT, INC., a Corporation, Defendant-Appellant.**

**No. 50847.**

Supreme Court of Missouri,

Division No. 2.

July 12, 1965.

Lantz Welch, Kansas City, Quinn, Peebles & Hickman, Kansas City, of counsel, for respondent.

Billy S. Sparks, Harold T. VanDyke, Kansas City, Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel, for appellant.

BARRETT, Commissioner.

On September 3, 1959, Wilma Dalton, 44, a buckle machine operator for the Nelly Don Garment Company, was a passenger on a Kansas City Transit Bus. She boarded the bus at 15th and Cleveland Streets and her destination was the Craftsman's Optical Company at 10th and Grand Avenue. There had been 15 or 20 passengers but as the bus left 12th Street there were but two passengers, Mrs. Dalton and Molly Jacobs. Mrs. Dalton intended to alight on "the other side" of 10th Street and she said that as the bus traveled west through 11th Street, "traveling pretty fast," 30 to 35 miles an hour, she rang the buzzer and started walking forward toward the front of the bus. She could see ahead and there were no automobiles or vehicles approaching the left of the bus and she said, "Well, as we came up to 10th Street we were traveling all along there at a very fast speed, and as we approached 10th Street, why, he came to a real sudden stop right in the intersection of 10th. * * * And the operator, he threw out his hands. I just started plunging forward, just flew to the front as we came to this sudden stop, and as he did he threw out his arm to catch my fall." She says that she "grabbed ahold of the pole" but it "tore loose" and she fell to the floor of the bus and was injured. Mrs. Jacobs corroborated Mrs. Dalton's version of the occurrence. The bus operator, Gadberry, says that passengers alighted and the bus left 11th Street with the green light, that he "drove about 10 to 15 miles an hour till I got to 10th Street and I got the red light there and I stopped for the red light" making "a nice" gradual stop. He says that the two ladies started to the front of the bus

at that point, with the bus in the center lane of a northbound three-lane trafficway "I started up and started across 10th Street and there was an automobile on my left cut in front of me to the right on 10th Street and I had to bring my bus to a quick stop." He says that he brought the bus to a stop in 6 or 8 feet at a speed of about "three mile per hour," and the ladies "come forward in the bus pretty quick" but he put out his arm and the younger lady, Mrs. Dalton, "didn't fall down at all, the young woman didn't; the old lady (Molly Jacobs, 73) fell down." He says that Mrs. Dalton helped Mrs. Jacobs up, both said they were not injured and Mrs. Dalton filled out his card.

In June 1960, Mrs. Dalton was in an automobile accident which she described as minor and not disabling. In January 1960 a myelogram "indicated a protruding disc" but her doctors did not recommend surgery. On February 3, 1961, Mrs. Dalton was operated on, the surgeon "removed a degenerated and protruded disc at the L–5, S–1 level on the left." This injury and the necessity of the operation were ascribed to Mrs. Dalton's fall in the bus on September 3, 1959. Mrs. Dalton submitted her case against the bus company upon the hypothesis that "it negligently caused, allowed or permitted said bus to suddenly stop with a violent lurch and jerk and in an unusual manner." On behalf of the transit company there was a hypothesis "that in order to avoid a collision with said automobile the driver of the bus brought the bus to a stop in the intersection of 10th Street * * * and if you further find that in so doing the operator of the bus used the proper degree of care in the operation of the bus and for the safety of himself, the bus and the passengers thereon * * * and was not negligent as set out in other instructions, then your verdict must be for the defendant and against the plaintiff." Nine members of the jury returned a verdict in favor of Mrs. Dalton for $35,000. Upon a nineteen-ground motion for new trial, including a claim of excessive verdict, the trial court required a remittitur of $10,000

and in the order made a specific finding as to the conduct of Juror Flaspohler.

Upon this appeal the bus company contends that Mrs. Dalton did not make a case of res ipsa loquitur as under her proof "there was no sudden stop with a violent lurch and jerk." It is urged that the court prejudicially erred in giving two instructions submitting her theory as in any event "the case could only be submitted under specific negligence." It is urged that the court erred in giving an instruction which defined "highest degree of care" as "the *utmost* care, caution, skill and vigilance which capable and very careful and prudent men, engaged in the business of operating motor buses as a common carrier transporting passengers for hire, would use and exercise under the same or similar circumstances to safely transport those who become its passengers." And, despite the remittitur, it is urged that the final judgment of $25,000 is excessive.

But the meritorious and very difficult but determinative question is whether the trial court abused its discretion in refusing to grant the appellant transit company a new trial because of the misconduct of Juror Flaspohler in failing to disclose pertinent information on the voir dire examination. In requiring the remittitur and in overruling the motion for a new trial the court entered this as a part of its order: "The court further specifically finds that juror, Sylvester Flaspohler, did not intentionally fail to answer voir dire questions propounded by both counsel in an effort to conceal certain matters and further that said juror apparently possessed no malice or ill feeling against this defendant. The court further finds that said juror's failure to divulge information appeared to the court to be a matter of misunderstanding rather than concealment and thus could not constitute grounds for granting defendant's motion for new trial and therefore * * * the court overrules defendant's motion for new trial."

At the very outset plaintiff's counsel admonished the jury panel to listen carefully

and to answer all questions as their failure in this regard might result in their verdict being set aside. First he asked the panel whether any of them had ever been involved with his law firm. One of the jurors responded that the firm had represented him in an automobile-truck collision which was settled out of court and this juror was excused when he said that he would be "(m)ore sympathetic towards the lady" (Mrs. Dalton). Another juror said that counsel's firm handled "a hit and run accident with a truck, involving my son, and they was handling the case for me" but the insurance company "went bankrupt." Another juror had had business dealings with defense counsel's firm.

Then plaintiff's counsel made the inquiry: "Now I want to know if any of the members of this panel or those in their immediate family have been *defendants in a lawsuit,* where you have been sued by somebody." A juror responded that a boy had run in front of his automobile January 14, 1961, but charges in police court were dismissed. Another juror said that a suit had been filed against him "but the disposition of it I never did know." Following this plaintiff's counsel said, "Now I am going to ask the converse of that question, the other side of the coin. *Has anyone on this jury panel or those in your immediate family been forced to file a lawsuit* against someone because you or the member of your family was an aggrieved party? This would be a plaintiff in the case like Mrs. Dalton is here today." One juror told about a suit he had filed to collect for injury to his automobile when hit by a truck. Another juror told about a 1950 suit involving an overcharge of rent under OPA which was settled out of court. Another juror told about a 1952 magistrate court suit to recover damages to his automobile, the case was settled out of court. A fourth juror told about his brother's pending suit for neck and back injuries sustained in an accident.

Then plaintiff's counsel made this fourth approach and put this question: *"Now, have any of the members of this panel ever had a claim made against you for money*—this also includes members of your immediate family—where someone claimed you owed them money, they didn't necessarily go so far as to have to hire a lawyer and sue you but they made this claim against you?" A juror told about a claim made against him when a thief stole his automobile and injured someone.

Defense counsel in his turn reviewed some of the events related by jurors in response to plaintiff's counsel then he inquired whether any of them had had controversies with the transit company or its predecessor. One juror told about satisfactorily settling a claim after a bus hit his automobile. Then counsel put the question: *"Has any member of the panel ever had a claim for personal injuries against any person or any company or any partnership, any kind of a claim for personal injuries?"* A juror asked whether that would include a claim his brother had involving a truck and a back injury "settled out of court." Another juror inquired whether counsel also meant "disability through Workmen's Compensation" and was informed that counsel was "going to get to that." This juror said that for a broken finger and cut wrist his employer had paid medical expense. Another told about his brother's pending suit for injuries and another told of his sister's claim of 30 years ago when she was hit by a streetcar while in a safety zone. Defense counsel again inquired whether "a member of their family have a claim against anybody for personal injuries."

And as he had forewarned defense counsel made this inquiry: "Now, Mr. Mergell told us about a Workmen's Compensation case. *I want to ask if any members of the panel have ever had a Workmen's Compensation claim.* That is where it is handled before the Workmen's Compensation Commission if you are injured on the job and you are paid automatically, not a question of proving any negligence as in this case, but where because you are injured on the job you automatically are paid if you are in-

jured by accident. *Any member of the panel ever had an accident on the job where they were paid Workmen's Compensation or were treated by their employer under the Workmen's Compensation law?*" A juror told about a "smashed finger" and the payment of medical expense. Juror Mergell again mentioned his experience, another told about a nail in his hand, hospitalization and the payment of some compensation.

Plaintiff's counsel given another opportunity again went into the question of suits and claims: "And Mr. VanDyke you noticed asked you quite a bit of questions about any claims made by you or members of your family. Now, sometimes these things slip your mind and, as I told you, an unintentional oversight on your part in answering one of these questions can have a verdict set aside. * * * So with that in mind, *is there anyone else that can think of a claim having been made by themselves or members of their immediate family?*" To this a juror responded and asked a question: "There was a case where I was thrown from a motor scooter in Lawrence, Kansas, and was injured slightly there and the insurance company made a settlement." Plaintiff's counsel said, "*I am glad you brought that up. This is an example, now, of what Mr. VanDyke was describing to you as a claim.* In other words, you don't have to go out and affirmatively say to the wrongdoer that hurt you, 'Give me some money,' sometimes the wrongdoer will come forward as in your case and say, 'Let me pay for what was done to you.' *This is a claim in the sense of the word as lawyers in court use it, so therefore, with that in mind, let's go into this question a little deeper.*" The juror then detailed his automobile-motor scooter experience and his signing a release. Another told of his wife being paid when she was "slightly injured" when a truck ran into the rear of a bus. Another juror told of an incident of 18 years ago when he slipped on a floor and fell and "they paid the doctor bill." Counsel said, "That's the type of thing we are looking for." And immediately another juror said, "I assume since these others have come up I might have something in that—no claim. My daughter was in an automobile accident and had a broken arm. There was no suit and the insurance company is paying for it."

■■■ The voir dire proceedings have been set forth in this detailed manner to demonstrate that the inquiries were not mere perfunctory questions, the subject of suits and claims by jurors or their families was exhaustive and painstaking. It was the principal subject of the entire process. This detailed résumé also places the problem in its precise context and factually serves to distinguish the cases. Juror Flaspohler was present throughout the entire examination and he asked no questions and gave no information as to any claims he may have had. It should also be noted in passing that at one point, when counsel for plaintiff renewed his inquiry and warned the jury against even unintentional oversight he said, "This bus company has very complete records on all claims made, so if there's any doubt in your mind at all about it, let's resolve it right now, because they know these things." But other than this bare assertion by counsel there is nothing in this record to show what if any records the appellant may have had and certainly nothing to show that it had any record or knowledge of Mr. Flaspohler's claims record. The only possible circumstance from which any inference could be drawn was the fact that the verdict was returned on January 30, 1964, and on February 13, 1964, appellant's claims agent of over 40 years and a lawyer appeared at Mr. Flaspohler's residence with a prepared affidavit which set forth his claims record. But this mere fact is of course insufficient to show that the appellant knew of Flaspohler's record and when the claims attorney testified on the motion for a new trial no one asked any questions or established any facts as to the company's knowledge or records and thus it does not appear that the appellant was lying in wait or sandbagging either the court or counsel for plaintiff.

The only fact developed was that the claims agent obtained the material for the affidavit prepared by him "by investigation." The consequence is that in these circumstances the court is not confronted, as has been suggested by at least one authority, with the necessity of re-examining one phase of Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, and of saying whether knowledge of Flaspohler's claims was accessible to the appellant prior to or during the voir dire examination so that thereby the appellant waived or was precluded from urging his claims record as a basis of error or prejudice. Annotation 38 A.L.R.2d 624, 630. With this phase of the problem aside the appeal is concerned only with the general rules and whether there was an abuse of discretion in applying what has come to be the test in this jurisdiction of "whether or not he (the juror) was guilty of an intentional concealment" (Beggs v. Universal C. I. T. Credit Corporation, Mo., 387 S.W.2d 499, 503), which necessarily must mean "whether or not the appealing party has been prejudiced in regard to his case by the juror's false answer to questions regarding prior claims." 38 A.L.R.2d 1. c. 626.

When the claims agent presented his affidavit on February 13th Mr. Flaspohler refused to sign it saying that he first wanted to consult a lawyer. The agent made an appointment to return next day at one o'clock and that day Mrs. Flaspohler informed the agent that her husband had gone fishing. Mr. Flaspohler was subpoenaed to appear when the motion for new trial was to be heard on April 3, 1964, but when the deputy sheriff served the subpoena was informed that Mr. Flaspohler had suffered a heart attack and his testimony was not given until May 8, 1964. But previously, on February 24, 1964, an affidavit prepared for Mr. Flaspohler was executed and filed. The substance of this affidavit was that he had refused to sign the affidavit presented by the claims agent because "the facts stated therein were not true" and that the agent had threatened to send the sheriff out to take him to the courthouse. In his affidavit Juror Flaspohler "remembers the accident in 1958 but did not feel that he had a claim since he did not have a lawyer and further that the insurance company had him treated by a doctor and that a man came out and paid him some money shortly after the accident in order to sign some papers." He remembered the 1953 accident "but states that he was not injured in said accident and did not go to any doctors and does not remember being paid any money for injuries. He does remember that his car was fixed." He "remembers being hurt different times on the job and that the company doctors looked after him but he never made a compensation claim for any disability."

In brief the true facts were that on July 17, 1958, Mr. Flaspohler was a passenger in a motor vehicle involved in a collision on the intercity viaduct. He received nine treatments in St. Joseph's Hospital for a back injury. There was also emergency room treatment and X rays. There was a doctor bill of $50.00, X ray $40.00 and on August 1, 1948, Mr. Flaspohler signed a release and was paid $500.00 for his personal injuries by the Farmers Insurance Group. An American Insurance Company file revealed that on December 26, 1953, Mr. Flaspohler's automobile was involved in a collision with a General Mills vehicle and "was paid $150.00 bodily injury and $180.38 property damage." While he claimed she was not a member of his "immediate family" it was developed on examination of Mr. Flaspohler that his granddaughter, now age 30, received a back injury when she was about 7 years old and as a result has been disabled most of her life.

As to his Workmen's Compensation the records of his employer the Koch Refrigeration Company reveal this record: February 1, 1953, he was given treatment for "a rash on the body," this only involved a doctor bill. On July 20, 1953 "he claims he popped his back" lifting a door and that involved payment for medical treatment. August 5, 1954, "foreign body in left eye"

and on August 7, 1954, "ran screw driver in left wrist" and medical treatment was required and paid for. On April 7, 1955, "struck his right arm with a piece of rusty metal" and that involved medical payment. On January 13, 1956, there was a "strained back moving a refrigerator, slipped on floor," that required X rays and medical treatment and "patient will be able to resume light work on 1–17–56." On March 30, 1959, there was a payment of medical expense for "foreign object in eye." There was medical payment of $116.00, hospital $249.50 and compensation payments of $141.15 for three and five-sevenths weeks' lost time, this probably for the inhalation of fumes.

When Mr. Flaspohler testified on May 8, 1964, he said that he remembered the lawyers asking the jury panel questions about "claims" by the jurors but he said, "Yes, but I understood it—you would have to be a lawyer or something—* * * yes, I have had little personal injuries like anybody else, but I didn't think anything of them. * * * I paid insurance for that and they took care of it." He did not respond to counsel's inquiries about on-the-job injuries although he recalled several of them and he heard other jurors responding and reporting injuries and claims. He said that he did not know that his on-the-job injuries were under the compensation law, "I'll tell you, like I told you, I paid insurance every month and they had a company doctor to take care of us and I thought that was all of it." At another point he said "if I'd thought that day (the day the questions were asked) it would have got me out of here I would have told you all them. I didn't think it amounted to anything and that's the reason I didn't say it. I would have been out a whole lot sooner." His interpretation of the questions or answers regarding automobile accidents was "I have never been involved in one myself at all." He did not remember how much he had been paid for any injuries, he didn't think it was $500.00, "they come down there and told me what they would do on my front porch and I told them, 'Well, that sounded fair,' and he sat right there and made a record of it and he's still got it, I guess, just what I said." Later, as to the $500 payment he said, "Well, I told you I don't remember just what he paid me, but I have been paying insurance ever since I have been there and it breaks even one way or the other." As to the 1953 incident, he said he received no injury, someone ran into his parked automobile and a man came out and said, "Take your car down on 18th and Grand. * * * Take your car down and have it fixed and we'll pay it." And he said, "That's what I done. They paid the bill. I didn't see a red cent of it." But finally as to the questions on voir dire and the response of other jurors Mr. Flaspohler said, "I remembered them, yes. * * * I didn't think anything that I had amounted to anything. If I did, I would have spoke up and been out the door like some of the rest of them did, where I would like to have went." Incidentally, Mr. Flaspohler was unemployed when the case was tried.

It would serve no useful purpose to analyze the undisputed facts or to characterize any of the testimony and indicate the reasonable and persuasive inferences. It is sufficient to say that Mr. Flaspohler unquestionably heard the questions and responses but nevertheless took it upon himself to judge whether his claims, even though small, were of sufficient magnitude or importance to disqualify him as a juror. With all deference, under the juror's own testimony, he heard and understood and so undeniably his failure to reveal his claims record was intentional. In addition to his nondisclosure of claims, in point of fact Mr. Flaspohler's affirmative vote was necessary to a finding of liability and it was necessary in fixing the amount of damages initially at $35,000. Bass v. Durand, 345 Mo. 870, 136 S.W.2d 988. While of course the fact of a nine to three verdict is not conclusive, particularly when the undisclosed claim is small and old and subject to being forgotten (Davis v. Kansas City Pub-

lic Service Co., Mo., 233 S.W.2d 679), "(t)he part played by the questionable juror in the rendition of the verdict has been a factor occasionally, a new trial being required if his conduct appeared to be a real factor in the jury's decision, but the verdict being allowed to stand if it was apparent that the jurors effect on it was not substantial." 38 A.L.R.2d 1. c. 627. There is of course a discretion in the trial court particularly when the question of intention turns on credibility or there is some tangible basis for a finding of inadvertent omission but it is not believed that the requiring of a remittitur of $10,000 is an exemplification of an exercise of discretion as to this particular issue. Compare Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S.W.2d 27 and Bass v. Duran, supra.

There is also no point in distinguishing and matching cases. The respondent relies on those in which for various reasons a new trial was denied or in which it was held that there was no abuse of discretion in refusing to grant a new trial because of a juror's nondisclosure of claims, to wit, the naive if not flighty lady in Mantz v. Southwest Freight Lines, Inc., Mo., 377 S.W.2d 414; and Hampy v. Midwest Hanger Company, Mo.App., 355 S.W.2d 415; Akers v. St. Louis Public Service Co., Mo., 370 S.W.2d 347 (where there was no "dissembling" and on the motion for new trial hearing all questions were promptly and forthrightly answered); Begley v. Adaber Realty & Investment Co., Mo., 358 S.W.2d 785; Barb v. Farmers Insurance Exchange, Mo., 281 S.W.2d 297, and Davis v. Kansas City Public Service Co., supra. On the other hand the appellant relies on the line of cases in which a trial court has sustained a motion for a new trial or this court, despite the overruling of a motion for a new trial, has been impelled to grant a new trial because of a juror's nondisclosure of claims, to wit: Piehler v. Kansas City Public Service Co., supra; Triplett v. St. Louis Public Service Co., Mo.App., 343 S.W.2d 670; Brady v. Black & White Cab Co., Mo.App., 357 S.W.2d 720; Logsdon v.

Duncan, Mo., 293 S.W.2d 944. Again with all deference to the trial court and again in realization of the severity of the penalty to an innocent plaintiff (Piehler v. Kansas City Public Service Co., supra), this appeal falls within the category of these latter cases, the juror admits the basic fact of an "intentional concealment" but excuses that he did not consider his claims important or significant. For the indicated reasons and in the particular circumstances the judgment is reversed and the cause remanded.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.