Hal Edward **HEADRICK**, Jr., a Minor by
and Through His Next Friend and Natural
Guardian, Hal Headrick, Sr., Respondent,

v.

Laura **DOWDY**, Appellant.

No. 53588.

Supreme Court of Missouri,
Division No. 1.

Feb. 9, 1970.

Samuel Goldblatt, St. Louis, for plaintiff-respondent; Ben J. Weinberger, St. Louis, of counsel.

Joseph H. Mueller, J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for defendant-appellant.

SEILER, Presiding Judge.

This is a suit for $35,000 damages by a 6-year-old child who ran out into the street after a ball and either ran into or was struck by defendant's automobile. The jury returned a verdict for the defendant. The trial court gave a new trial on the ground plaintiff had not had a fair and impartial trial because of failure of a juror to disclose on voir dire prior claims, lawsuits, and whether or not he knew plaintiff's lawyer or was involved in any pending litigation. The defendant appeals, on two grounds: that plaintiff failed to make a submissible case and that the court erred in the ruling on the juror.

Did plaintiff make a submissible case, which he submitted to the jury on an instruction hypothesizing that defendant either failed to keep a careful lookout, or knew or by the use of the highest degree of care should have known there was a reasonable likelihood of collision in time

thereafter to have stopped, slackened speed, or sounded a warning, but failed to do so, etc.? There was evidence from which the jury could have found the following: North Market Street, in St. Louis, runs east and west. The accident happened in the 2200 block, which is an area of brick, two and three-story dwellings or flats, most of which come right up to the sidewalks with no front yard or lawn and little, if any, side yards. The street is level, with asphalt paving, 36 feet wide, with the usual city curbings. There is parallel parking of automobiles on both sides. The weather was clear and dry. The date was May 26, 1966, and it was about 4:30 p. m. The defendant, driving a 1965 Mustang, accompanied by Mrs. Minnie Anderson, was headed west on Market, going home from work. Her automobile was equipped with power brakes and power steering. The tread on the tires was good and the brakes were in good working order, as was the horn.

We are particularly interested in the north side of the street, because it was from the north that plaintiff ran into the street. The accident happened in the street about 130 to 140 feet west of the intersection of North Market and 22nd Street. The first 94½ feet of the north side of Market, proceeding west from the intersection, is occupied by an abandoned garage and filling station. These two buildings sit back 25 feet or more from the sidewalk along the north side of Market and do not figure in the accident other than being used as points of reference by witnesses. Next west is a two-story flat, 2209 North Market, 16½ feet in width. The front of this flat sits back 32 feet from the north curb of Market. Plaintiff's cousin, with whom he was playing, lives at 2209. Next is 2211 Market, another brick, two-story flat, but there is an open space of 8 feet, 9 inches between 2209 and 2211. Everyone in the case refers to this open space as a gangway. The gangway is about 117 feet west of the west edge of the intersection. 2211 Market does not sit back from the side-

walk as does 2209, but instead comes up to the north edge of the sidewalk. The sidewalk is 11 to 12 feet wide and it extends to the curb.

Plaintiff and his cousin were playing with a ball in the gangway and the ball went out in the street. Plaintiff ran after it. The question is, when should defendant have seen plaintiff running after the ball and what could defendant do about it? Defendant was driving on the right hand side of Market as she crossed the intersection of 22nd and Market. She had stopped at the intersection, on the east side of 22nd, to let cross traffic pass. After crossing the intersection, defendant estimated she picked up speed to around 15 to 20 miles per hour. An adult eye witness put her speed somewhere between 20 and 30 miles per hour. At one point defendant said she was going 20 to 25 miles per hour when she saw the child.

Defendant never did see a ball roll out into the street, although she said there was nothing that would have prevented her from seeing it. However, her companion, Mrs. Anderson, saw the ball "come out here" and "glanced like anyone would do and I seen this ball go across." Mrs. Anderson said she saw the ball going across the street from north to south and called defendant's attention to it; defendant denied this. Mrs. Anderson said the ball was red, white, and blue, not as big as a beach ball, but a little bit bigger than a baseball.

Mrs. Anderson testified she (Mrs. Anderson) saw the child coming out of the gangway and knew right then he was chasing the ball. Defendant testified she (defendant) did not see the running boy until she saw something moving to the north side of the street, in front of one of the parked cars and then she saw the boy come out from the car. Defendant said she swerved to her left, put on her brakes, blew the horn, and was either stopped or almost stopped at impact. However, there was evidence defendant did not apply her brakes until after she swerved, that no

skid marks were left by her car, that there was no sound of squealing brakes or tires, and that no horn was heard to sound. There were no other moving westbound or eastbound automobiles in the immediate area. There was testimony the cars between which the boy ran out were 6 or 7 feet apart. There was also testimony to the effect there were no cars parked along the north curb east of the gangway, (if this were true, there would have been no obstruction to defendant's view of the area between the street and the gangway as she approached from the east). Plaintiff's father testified defendant told him at the scene she did not see the child.

The impact was against the side of the right front fender, which plaintiff ran into with his head and hands. He tried to hold onto the fender, but his feet went under the car. He suffered a compound fracture of his left leg. There was a dispute as to whether the automobile was still sufficiently in motion that the front wheel rolled slowly onto the leg. The impact was at a point about 10 feet north of the south curb and about 12 feet west of the gangway, so plaintiff evidently was running across the street on a diagonal, west and south.

If by testifying she saw him come out of the gangway, Mrs. Anderson meant the end of the gangway as fixed by the south front of the flat at 2209 Market, then the boy had about 21 feet to go to reach the north curb and another 29 feet or so in the street to the point of impact. If by the end of the gangway she meant the end as fixed by the south front of the flat at 2211 Market, which came to the north side of the sidewalk, then the boy had about 11 feet to go to reach the curb, or a total of 40 feet to the point of impact. The witnesses were agreed the boy was running fast, that he "had his speed up."

But the defendant did not see the boy until he was coming out between the parked cars along the north curb. If we put the width of the parked cars at 6 feet and assume they were parked within a foot of the curb, as appears to be true in the photographs which witnesses said showed the cars parked in approximately the same positions as at the time of the accident, the boy would have travelled about 24 feet from where defendant testified she first saw him to the point where he ran into the side of the right front fender. While he was covering this distance defendant was first swerving her car left, and then from a speed of somewhere between 15 and 30 miles per hour, bringing her car to a complete stop or almost a stop.

If defendant's companion, Mrs. Anderson, saw the little boy ahead and laterally coming out of the gangway, running fast, the jury could have found that defendant in the exercise of the highest degree of care to look ahead and laterally ahead as she drove along this rather narrow street with most of its closely spaced dwellings coming right up to the sidewalk line, could and should have seen what the passenger saw, Edwards v. Dixon (Mo.App.) 298 S.W.2d 466, 470, and cases there cited. If so, she would have seen the approach of the child sooner—specifically, when he was some 16 to 26 feet from the point where she did first see him. The defendant almost succeeded in stopping short of his path as it was. If she had started defensive measures 16 to 26 feet sooner than she did, the jury could reasonably have found that the accident would have been avoided, Peterson v. Tiona (Mo.Sup.) 292 S.W.2d 581, 583–584. Actually, the jury could have found that she would have had more than an additional 16 to 26 feet, because she was going faster than the boy was running.[1] Defendant was going some-

---

[1]. Various cases have held a child of this age, running fast, can run 10 miles per hour for a short distance, Vietmeier v. Voss (Mo.Sup.) 246 S.W.2d 785, 788; Harris v. Lane (Mo.App.) 379 S.W.2d 635, 638; Dillon v. Hogue (Mo.App.) 381 S.W.2d 599, 602–603.

where between 15 and 30 miles per hour when she started to react. So while the boy was running the above calculated 16 to 26 feet, the defendant was going somewhere between one and a half to three times as far. Thus she could have started acting anywhere from 24 to 78 feet sooner than she did. The jury, therefore, could have found under the evidence that defendant was negligent on all grounds submitted.

■■■■ A child's ball rolling across the street ahead of an approaching automobile in an area with solidly packed dwellings such as shown in the photographs and plat here, is an alarm to the driver that a child might be following the ball, Ozbun v. Vance (Mo.Sup.) 323 S.W.2d 771, 775, 776. The careful driver would look in the direction from which the ball came, especially when, as here, there were no other moving vehicles in the vicinity to divert his attention. We do not hold defendant was required to stop, slacken speed, or sound the horn upon appearance of the ball in the street, but a child's ball does not generally roll out in the street without propulsion and it is a sign children may be at play nearby. Although defendant said she did not see the ball, Mrs. Anderson, whose view of the street ahead was no better than defendant's, saw it and as she said, "glanced like anyone would do." The jury could reasonably have found defendant should have seen the ball, too, and that immediately her lookout should include possible routes of approach for a child who might be imprudently chasing after the ball, even though defendant's car was approaching. Under these circumstances, it was a question for the jury whether defendant in the exercise of the required degree of care should have seen the child before she did see him—when he ran out of the gangway, as Mrs. Anderson did, or if not, then certainly well before he reached the street.

Defendant argues that Mrs. Anderson's testimony was so contradictory and confusing as to be without probative value within the rule of Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644 and other cases cited. It is true that her testimony was so contradictory and confusing as to be worthless on the points of where defendant's automobile was when Mrs. Anderson first saw the plaintiff running, when and where Mrs. Anderson first said anything to defendant about the ball or the boy, and when defendant swerved her car. But this is not true as to Mrs. Anderson's testimony about seeing the ball roll out in the street, about seeing the boy run out from the end of the gangway after the ball, and about the boy's running fast. As to these important points Mrs. Anderson's testimony was consistent and the jury was not faced with speculating between different and inconsistent versions on her part as to which was true or false. If the jury chose to believe Mrs. Anderson on these points, taking into consideration the other evidence favorable to plaintiff as we have set out, then the jury could have arrived at the conclusions we have set forth, Zagarri v. Nichols (Mo.Sup.) 429 S.W.2d 758.

Additionally, on the physical facts, when plaintiff ran out from the gangway, defendant's automobile of necessity had to be quite a distance back east, which supports Mrs. Anderson on what she, and, therefore, defendant, too, could see. At 10 miles per hour it took the boy between 2.7 and 3.4 seconds to have reached the point of impact after he ran out the end of the gangway. If defendant was approaching for this length of time at 30 miles per hour, she was from 119 to 150 feet away; if at 15 miles per hour, from 59 to 75 feet away. There would have been a deceleration factor in her last 15 or 20 feet of travel, because her brakes were slowing her speed, so she did not approach the entire distance at either the 15 or 30 miles (or something in between) speed, but even so, it is evident she had ample room in which to stop, as " * * * it is now common knowledge that properly equipped automobiles traveling at a speed of 20 miles an hour, including reaction time, can be

stopped in less than 50 feet * * *", Losh v. Benton (Mo.Sup.) 382 S.W.2d 617, 619; see also authorities cited in Jones v. Fritz (Mo.App.) 353 S.W.2d 393, 397, fn. 3.

▮ Turning to defendant's second point, as to the juror, the evidence was as follows: about a third of the way through the voir dire examination plaintiff's counsel launched into the following line of inquiry: "Now, I am going to ask you a very important question and kindly—we have gone over it a little bit—but, kindly go back over your memory and your mind and try to think a minute before you answer this. Is there anyone here on this panel—and, again, remember the immediate family—who have ever made a claim for an injury of some kind, you did not have to come to court, you did not even have to have a lawyer, but there was some type of occurrence, maybe a man came to your home and gave you money for the payment of something, maybe a medical bill, or something, any member of this panel, or their immediate family ever been injured and a claim made for a personal injury of some kind? Will you all kindly please raise your hand? That's either to yourself or your immediate family—that would be your wife, husband, maybe a child, brother or sister, mother or father." The question is somewhat fuzzy, granted, but even so it should have alerted the average juror that counsel was asking for disclosure of any claims made by the juror or members of his immediate family. Counsel then proceeded to question the jurors one by one in light of the general query. Out of the first 15 jurors next questioned, 10 proved to have had claims personally or else someone in their immediate family had. In each instance there was further questioning by counsel and responses by the jurors as to their experiences.

Juror Harris, who turned out to be the foreman, was the sixteenth juror question-

ed. Counsel addressed him, "Mr. Harris?" Juror Harris responded, "No claims." Counsel passed on to the next juror. The facts were, however, as shown on the hearing held on the motion for new trial, that juror Harris, a taxicab driver, was the plaintiff in a lawsuit where he had been hit in the rear and was suing for damages.[2] He was represented by counsel and the case was tried in St. Louis before the same judge a little less than four years before the present trial. The trial lasted a couple of days. The jury returned a verdict against juror Harris. Harris admitted remembering about his case and its trial. He was not asked for and volunteered no explanation as to why he did not disclose this information on voir dire. He testified he remembered the panel in the present case being asked whether they or their family had any claims and that he answered in the negative. He said that his own case did not in any way affect his conduct as a juror in the present case, and that he had tried to answer the questions on voir dire as truthfully and honestly as he could. The trial court was not, of course, bound to accept his statement as true, Brady v. Black and White Cab Company (Mo.App.) 357 S.W.2d 720, 726.

Earlier in the voir dire plaintiff's counsel inquired whether anyone knew him, either professionally or socially. The response of the panel was silence. Plaintiff's counsel also asked a general question about whether any members of the panel had had a claim made against them or their family. To this juror Harris answered, "Well, I have a number but I was the cab driver and they made a claim against the company, but they didn't—", and in response to follow-up questions said further, "Several came to court, but they was never settled in court" and "I mean I made appearances in court and that." At the hearing on the motion for new trial, Harris testified that a few days after

---

2. Plaintiff's counsel, by affidavit accompanying his timely motion for new trial, stated this information was not discov-ered by counsel until after the trial. There was no counter affidavit or other challenge of this asserted fact.

completion of the trial of the case at bar he saw plaintiff's attorney in magistrate court in connection with three cases counsel had against the cab company, growing out of an accident in which Harris was the cab driver. Harris also testified he recalled a case in circuit court where a Mr. Gant was suing Alden Cab Company and Harris, although defendant's counsel pointed out the court's minutes in that case showed that plaintiff dismissed as to Harris. Harris denied ever seeing plaintiff's counsel until trial of the present case and there was no evidence presented indicating otherwise.

Defendant's predicament as shown by her authorities on the point under consideration, as well as by Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 491–492, 129 A.L.R. 795 and Logsdon v. Duncan (Mo.Sup.) 293 S.W.2d 944, 947, is that we are reviewing a case where the trial court granted, instead of refused, a new trial. The trial court evidently was convinced the conduct of juror Harris amounted to deception, not merely forgetfulness and that plaintiff was thereby deprived of a fair trial. We cannot say the ruling was without any evidence to support it. Harris had been driving for 43 years. As a cab driver, the record showed he had been involved in damage suit litigation where people were trying to recover from the cab company. It seems unlikely that he would forget about his own case. The experience which juror Harris had had as a recent plaintiff himself may have prejudiced him against allowing someone else to recover money damages for personal injuries after a jury had turned him down on his own claim. Certainly lack of knowledge of this possibility handicapped plaintiff's counsel in advantageously exercising his peremptory challenges, Sadlon v. Richardson (Mo. App.) 382 S.W.2d 9, 12. The trial court saw and heard the juror and made a judgment as to the prejudicial effect of his nondisclosure. Defendant has not shown that in so doing the trial judge abused his judicial discretion. We therefore overrule defendant's claim of error in the ruling on the juror.

The judgment ordering a new trial is affirmed.

HOLMAN, J., and HOWARD, Special Judge, concur.

STORCKMAN, J., not sitting.